# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

*Beauregard Parish Police Jury, Bossier Parish, Caddo Parish, Caldwell Parish, Cameron Parish, Catahoula Parish Police Jury, Claiborne Parish, Concordia Parish, Franklin Parish, Iberia Parish, Jackson Parish Police Jury, Jefferson Davis Parish Police Jury, Lasalle Parish, Red River Parish, Richland Parish, St. Charles Parish, St. Martin Parish, St. Mary Parish, Tensas Parish, Union Parish, Vermilion Parish Police Jury, Webster Parish, West Baton Rouge Parish, Bossier City, Town of Baldwin, Town of Berwick, Morgan City, City of Franklin, City of Patterson, City of New Iberia, City of Natchitoches, Kenner City, Susan Hutson (o/b/o of Orleans Parish Sheriff's Office), Joseph Lopinto III in his capacity of Sheriff o/b/o Jefferson Parish Sheriff's Office, Blaise Smith in his capacity of Sheriff o/b/o St. Mary Parish Sheriff's Office, Rickey Jones in his capacity of Sheriff o/b/o Tensas Parish Sheriff's Office, Greg Champagne, in his capacity of Sheriff o/b/o St. Charles Parish Sheriff's Office, David Hedrick in his capacity of Sheriff o/b/o Concordia Parish Sheriff's Office, Toney Edwards, in his capacity of Sheriff o/b/o Catahoula Parish Sheriff's Office, St. Mary Parish School Board, Iberia Parish School Board, Benton Fire Protection District No. 4, Bossier Parish Emergency Medical Services Ambulance District, Red River Fire Protection District, Caddo Fire Protection District No. 1, Desoto Fire Protection District No. 8, West Baton Rouge Fire Protection District No. 1, St. Tammany Fire Protection District No. 1, St. Tammany Fire Protection District No. 2, St. Tammany Fire Protection District No. 3, St. Tammany Parish Fire Protection District No. 4, St. Tammany Parish Fire Protection District No. 5, St. Tammany Parish Fire Protection District No. 12, St. Tammany Parish Fire Protection District No. 13, A-MMED Ambulance, North Caddo Hospital Service District, CLHG-Ruston,*

**COMPLAINT**

**JURY TRIAL DEMANDED**

*LLC, Louisiana Assessors Insurance Fund, The University System of Louisiana; Board of Supervisors for Louisiana State University and Agricultural and Mechanical College*

Plaintiffs

v.

*McKinsey & Company, Inc., McKinsey Holdings, Inc., McKinsey & Company, Inc. United States, and McKinsey & Company, Inc. Washington D.C.*

Defendants

Plaintiffs, Beauregard Parish, Bossier Parish, Caddo Parish, Caldwell Parish, Cameron Parish, Catahoula Parish, Claiborne Parish, Concordia Parish, Franklin Parish, Iberia Parish, Jackson Parish, Jefferson Davis Parish, Lasalle Parish, Red River Parish, Richland Parish, St. Charles Parish, St. Martin Parish, St. Mary Parish, Tensas Parish, Union Parish, Vermilion Parish, Webster Parish, West Baton Rouge Parish, Bossier City, Town of Baldwin, Town of Berwick, Morgan City, City of Franklin, City of Patterson, City of New Iberia, City of Natchitoches, Kenner City, Susan Hutson (o/b/o of Orleans Parish Sheriff's Office), Joseph Lopinto III in his capacity of Sheriff o/b/o Jefferson Parish Sheriff's Office, Blaise Smith in his capacity of Sheriff o/b/o St. Mary Parish Sheriff's Office, Rickey Jones in his capacity of Sheriff o/b/o Tensas Parish Sheriff's Office, Greg Champagne, in his capacity of Sheriff o/b/o St. Charles Parish Sheriff's Office, David Hedrick in his capacity of Sheriff o/b/o Concordia Parish Sheriff's Office, Toney Edwards, in his capacity of Sheriff o/b/o Catahoula Parish Sheriff's Office, St. Mary Parish School Board, Iberia Parish School Board, Benton Fire Protection District No. 4, Bossier Parish Emergency Medical Services Ambulance District, Red River Fire Protection District, Caddo Fire Protection District No. 1, Desoto Fire Protection District No. 8, West Baton Rouge Fire Protection District No. 1, St.

Tammany Fire Protection District No. 1, St. Tammany Fire Protection District No. 2, St. Tammany Fire Protection District No. 3, St. Tammany Parish Fire Protection District No. 4, St. Tammany Parish Fire Protection District No. 5, St. Tammany Parish Fire Protection District No. 12, St. Tammany Parish Fire Protection District No. 13, A-MMED Ambulance, North Caddo Hospital Service District, CLHG-Ruston LLC, Louisiana Assessors Insurance Fund, The University System of Louisiana; Board of Supervisors for Louisiana State University and Agricultural and Mechanical College (collectively, "Plaintiffs") file this Complaint against Defendants McKinsey & Company, Inc.; McKinsey Holdings, Inc.; McKinsey & Company, Inc., United States, and McKinsey & Company, Inc. Washington D.C. (collectively "McKinsey"). Plaintiffs allege as follows:

## INTRODUCTION

1.      McKinsey—a global consulting firm with significant expertise in the pharmaceutical industry—for years served as the outside marketing arm for Purdue Pharma, L.P. ("Purdue"), creating and helping to implement marketing strategies and tactics to bolster the sales of Oxycontin, a Schedule II drug[1] that is widely recognized as among the most frequently diverted and abused opioids. As Purdue faced growing scrutiny, McKinsey also helped the company protect its public image and to profit from the market for illicit opioids that predictably developed, and which McKinsey's tactics helped to promote and maintain.

2.      McKinsey's relationship with Purdue dates back to at least 2004, but the company kept this partnership successfully under wraps for well over a decade. Even now, Plaintiffs have

---

[1] Since passage of the Controlled Substances Act ("CSA") in 1970, opioids have been regulated as controlled substances. Controlled substances are categorized in five schedules, ranked in order of their potential for abuse. The CSA imposes a hierarchy of restrictions on prescribing and dispensing drugs based on their medicinal value, likelihood of addiction or abuse, and safety, with Schedule I being the highest and encompassing drugs with no currently accepted medical use and a high potential for abuse. Opioids generally had been categorized as Schedule II or Schedule III drugs. Schedule II drugs have a high potential for abuse, have a currently accepted medical use, and may lead to severe psychological or physical dependence. 21 U.S.C. § 812.

obtained details only about McKinsey's conduct dating back to 2009, around which this Complaint centers.

3.      Meanwhile, McKinsey also advised other opioid makers, including Janssen Pharmaceuticals and Endo. From at least 2003 and continuing for more than a decade, McKinsey worked for Janssen on its Duragesic opioid product. Janssen was evidently satisfied with that work, as McKinsey also advised Janssen on boosting sales of its Nucynta opioid in 2011. McKinsey also worked on behalf of Endo Pharmaceuticals on marketing Opana ER in 2015.

4.      McKinsey's lending its expertise to help to other opioid manufactures grow their sales was not a conflict of interest with its relationship with Purdue. Rather, each of these opioid makers, along with others, conspired together to grow the overall market for opioids as part of their efforts to increase sales of their own individual products. That conduct is the subject of a separate complaints Plaintiffs filed individually against these and other defendants. McKinsey recognized the value of collaboration, urging Purdue to band together with other manufacturers to "defend against strict treatment" by the federal Food & Drug Administration ("FDA").

5.      McKinsey understood Purdue's goals and the work it would need to perform to maintain and even grow Purdue's opioid profits amidst a growing epidemic of addiction and abuse. Part of McKinsey's work involved assessing the "underlying drivers" of OxyContin's (financial) performance. As described below, these drivers boil down to two things: (1) a widespread deceptive marketing campaign; and (2) fueling an illicit market for non-medical use. Purdue entered into guilty pleas arising out of both types of conduct in 2007 and 2020, respectively. McKinsey delved into the "granular" aspects of Purdue's sales and promotion. And, through the two companies' long-term relationship, McKinsey understood Purdue's business "both in terms of content and culture," as its own renewed consulting agreement assured in 2013.

6.      It could not have escaped McKinsey's notice that Purdue's parent company and three Purdue officers pled guilty to illegally marketing and promoting Oxycontin to prescribers and consumers in May of 2007. That agreement included an admission that "supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications." Part of this deceptive messaging included highlighting Oxycontin as a long-acting ("LA") or extended release ("ER") opioid and suggesting it created less chance for addiction than "immediate release" opioids because it had fewer "peak and trough" blood level effects or "did not cause a 'buzz' or euphoria" in the same manner as these other opioids.

7.      Parents who had lost their children to OxyContin overdoses traveled to a Virginia courthouse "from as far away as Louisiana, Massachusetts and California" to urge the judge at a July 2007 sentencing hearing to order prison time for the individual executives.[2] Media reports readily available to McKinsey described "heart wrenching testimony" from parents, including a mother who described parents as "given a life sentence due to [Purdue's] lies and greed" and explained: "Our children were not drug addicts, they were typical teenagers."[3]

8.      Following the guilty plea, Purdue, unwilling to change its ways, leaned on McKinsey for both its sales campaign and its efforts to portray itself as a good corporate citizen desiring to do the right thing. In 2009, McKinsey, upon information and belief, stepped in to help Purdue devise ways to counter "emotional messages from mothers with teenagers that overdosed [o]n OxyContin." As part of this strategy, a McKinsey and Purdue team considered spreading their own message through pain patients who would be perceived as more credible sources suggesting

---

[2] Barry Meier, 3 Executives Spared Prison in OxyContin Case, N.Y. Times (July 21, 2007), https://wwwnytimes.com/2007/07/21/business/21pharma.html.
[3] Id.

a need for controlled or extended release opioids — even though the team devising this strategy would have known that extended release opioids did not substantially control pain better than lower-dose, immediate release opioids. McKinsey also coached Purdue on building "trust" (which from its vantage point, McKinsey knew was misplaced) in Purdue following its criminal conviction.

9.      McKinsey also urged Purdue to capitalize on OxyContin's extended-release characteristics in another way: marketing OxyContin's 12-hour dosing as meaning that users only need to take OxyContin twice a day, thus requiring fewer pills. OxyContin in fact was well known to wear off after 8 to 10 hours in many patients, however. This "end of dose failure" leads to a vicious cycle that became, in the words of one neuropharmacologist, "the perfect recipe for addiction."[4] What McKinsey called "convenient," would later be called "a [d]escription of Hell."[5]

10.     For years, McKinsey advised Purdue on, and helped to implement, various strategies to raise sales of Oxycontin by focusing on high dose sales and deceptively messaging to physicians that OxyContin would improve function and quality of life. For example, McKinsey also urged Purdue to maximize sales by dictating, to a greater degree, which prescribers its sales representatives would target, exploring ways to increase the amount of time those sales representatives spent in the field increasing opioid sales, and prioritizing OxyContin in incentive compensation targets.

11.     In 2013, amidst concerns about declining sales as Purdue lost patent exclusivity for its original formulation of OxyContin and sought to market a reformulated version as purportedly safer and abuse-deterrent, McKinsey developed for Purdue an entire marketing initiative—

---

[4] Harriet Ryan, "'You Want a Description of Hell?' OxyContin's 12-Hour Problem," Los Angeles Times, May 5, 2016, available at http://www.latimes.com/projects/oxycontin-part1/.
[5] *Id.*

"Evolve to Excellence" or "E2E" — ultimately implemented as a plan to "turbocharge" opioid sales and also known as "Project Turbocharge." McKinsey advised that Purdue would see a greater return on its sales investment by focusing its targets, including on prescribers with alarming prescribing patterns that raised red flags they were writing "prescriptions" for non-medical use. Its plan aimed at boosting sales of OxyContin by targeting the highest volume opioid prescribers, without addressing whether the expanded sales would be for an illicit market.

12.     Purdue had a legal obligation not to target these prescribers; rather, it was obligated to report their conduct to law enforcement. Purdue later entered into a second criminal plea agreement for, among other things, failing to report and provide complete information to the U.S. Drug Enforcement Administration ("DEA") regarding prescribers its internal anti-diversion programs indicated should not have been targeted and which, in some cases, Purdue visited, or "detailed," to encourage them to prescribe opioids.

13.     McKinsey delivered the results Purdue wanted, and profited handsomely— it received more than $38 million for its work for Purdue from 2008-2013 alone. In pursuit of these profits, McKinsey continued to help Purdue grow opioid sales even after Purdue reached a 2015 Assurance of Discontinuance with New York arising out of an investigation concerning its Abuse and Diversion Detection ("ADD") program and media coverage highlighted its lack of attention to diversion control. McKinsey's own work elsewhere identified "reducing prescribing"[6] as among the efforts to combat the opioid epidemic and also showed that opioid prescribers were frequently writing prescription for patients with known risks of abuse. Still, McKinsey continued to work to help opioid manufacturers increase opioid sales, including through Purdue's deceptive marketing campaign.

---

[6] https://www.mckinsey.com/industries/healthcare-systems-and-services/our-insights/why-we-need-bolder-action-to-combat-the-opioid-epidemic (Sept. 6, 2018).

14.     Only after Purdue faced mounting legal pressure and reduced its sales force, and McKinsey's own reputation became tarnished, did McKinsey finally step away from its work for Purdue and later cease "opioid-specific" work on behalf of other clients altogether. Belatedly, McKinsey acknowledged what it described as the "implications of its work" on "the epidemic unfolding in our community or the terrible impact of opioid misuse and addiction on millions of families across the country."

15.     As a direct and foreseeable result of McKinsey's conduct, the nation and Plaintiffs' communities are now swept up in what the CDC has called a "public health epidemic" and what the U.S. Surgeon General has deemed an "urgent health crisis."[7] In 2015, an estimated 2 million Americans were addicted to prescription opioids and 591,000 to heroin. From 1999 to 2016, more than 200,000 people died in the U.S. from overdoses related to prescription opioids—more than the number of Americans who died in the Vietnam War.

16.     Overdoses have been killing people at a pace faster than the H.I.V. epidemic did at its peak. As Robert Anderson, who oversees death statistics at the CDC, explained: "'I don't think we've ever seen anything like this. Certainly not in modern times.'"[8]

17.     According to the director of the CDC, one out of every 550 patients started on opioid therapy die of opioid-related causes a median of 2.6 years after their first opioid prescription. As the then CDC director concluded: "We know of no other medication routinely used for a nonfatal condition that kills patients so frequently."[9]

---

[7] CDC, Examining the Growing Problems of Prescription Drug and Heroin Abuse (Apr. 29, 2014), available at http://www.cdc.gov/washington/testimony/2014/t20140429.htm;. Vivek H. Murthy, Letter from the Surgeon General, August 2016, available at http://turnthetiderx.org.
[8] Associated Press, Drug Overdoses Killed 50,000 in U.S., More than Car Crashes, (Dec. 9, 2016), https://wwwnbcnews.com/health/health-news/drug-overdoses-killed-50-000-u-s-more-car-crashes-n694001.
[9] Frieden and Houry, Reducing the Risks of Relief – The CDC Opioid-Prescribing Guideline, NEJM, 4/21/16, at 1503.

18.     As many as 1 in 4 patients who receive prescription opioids long-term for chronic pain in primary care settings struggles with addiction. Prescription opioids at the molecular level and in their effect, closely resemble heroin. Prescription opioids are synthesized from the same plant as heroin, have similar molecular structures, and bind to the same receptors in the human brain. And, the link between prescription narcotic painkiller abuse and subsequent and/or simultaneous heroin abuse continues to grow. Across the country, 80% of recent heroin users have previously used prescription opioids non-medically. As the American Society of Addiction Medicine has explained, four out of five people who try heroin today started with prescription painkillers.

19.     Meanwhile, the intersection of the COVID-19 pandemic increases the risks for those struggling with opioid use disorder and the strain on efforts to combat the opioid epidemic. The National Institute on Drug Abuse (NIDA)'s prediction that "we're going to see deaths climb"[10] has proven tragically accurate in Louisiana, with a three-month period in 2020 described as the deadliest for opioid overdose since the opioid epidemic began.

20.     This human tragedy cannot be calculated or compensated. And, as communities have worked to save lives, the opioid epidemic has continued to outpace their efforts. The financial burden to Plaintiffs is staggering. Plaintiffs provide services to confront this public health epidemic. Narcan administration has saved hundreds of lives. Expanded addiction treatment services, recovery housing, and innovative programs have sought to help people heal. Plaintiffs would further expand these efforts, but have only so much funding, which the demands of this

---

[10] Dan Goldberg and Brianna Ehley, Trump officials, health experts worry coronavirus will set back opioid fight, Politico, April 10, 2020, available at https://www.politico.com/news/2020/04/10/trump-officials-health-experts-worry-coronavirus-will-set-back-opioid-fight-179257. (quoting Nora Volkow, Director of NIDA).

unprecedented epidemic have so overwhelmed. Plaintiffs are also faced with increased costs of drug crimes and other public services because of the opioid epidemic.

21.     McKinsey's conduct violates the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and Louisiana state-law counterpart thereto, La. R.S. § 15"1353 et seq., Additionally, McKinsey's conduct constitutes a public nuisance, civil conspiracy, and unjust enrichment. Accordingly, Plaintiffs bring this action to hold McKinsey accountable for their conduct and seek abatement, damages, and any other injunctive and equitable relief within this Court's powers to redress and halt these unfair, deceptive, and unlawful practices.

## PARTIES

### A. Plaintiffs

22.     Beauregard Parish, a political subdivision of the State of Louisiana, by and through the Beauregard Parish Police Jury;

23.     Bossier Parish, a political subdivision of the State of Louisiana, by and through the Bossier Parish Police Jury;

24.     Caddo Parish, a political subdivision of the State of Louisiana, by and through the Caddo Parish Commission;

25.     Caldwell Parish, a political subdivision of the State of Louisiana, by and through the Caldwell Parish Police Jury;

26.     Cameron Parish, a political subdivision of the State of Louisiana, by and through the Cameron Parish Police Jury;

27.     Catahoula Parish, a political subdivision of the State of Louisiana, by and through the Catahoula Parish Police Jury;

28.     Claiborne Parish, a political subdivision of the State of Louisiana, by and through the Claiborne Parish Police Jury;

29.     Concordia Parish, a political subdivision of the State of Louisiana, by and through the Concordia Parish Police Jury;

30.     Franklin Parish, a political subdivision of the State of Louisiana, by and through the Franklin Parish Police Jury;

31.     Iberia Parish, a political subdivision of the State of Louisiana, by and through the Iberia Parish Police Jury;

32.     Jackson Parish, a political subdivision of the State of Louisiana, by and through the Jackson Parish Police Jury;

33.     Jefferson Davis Parish, a political subdivision of the State of Louisiana, by and through the Jefferson David Parish Police Jury;

34.     Lasalle Parish, a political subdivision of the State of Louisiana, by and through the LaSalle Parish Police Jury;

35.     Red River Parish, a political subdivision of the State of Louisiana, by and through the Red River Parish Police Jury;

36.     Richland Parish, a political subdivision of the State of Louisiana, by and through the Richland Parish Police Jury;

37.     St. Charles Parish, a political subdivision of the State of Louisiana, by and through the St. Charles Parish Council;

38.     St. Martin Parish, a political subdivision of the State of Louisiana, by and through the St. Martin Parish Police Jury;

39.     St. Mary Parish, a political subdivision of the State of Louisiana, by and through the St. Mary Parish Police Jury;

40.     Union Parish, a political subdivision of the State of Louisiana, by and through the Union Parish Police Jury;

41.     Tensas Parish, a political subdivision of the State of Louisiana, by and through the Tensas Parish Police Jury;

42.     Vermilion Parish, a political subdivision of the State of Louisiana, by and through the Vermilion Parish Police Jury;

43.     Webster Parish, a political subdivision of the State of Louisiana, by and through the Webster Parish Police Jury;

44.     West Baton Rouge Parish, a political subdivision of the State of Louisiana, by and through the West Baton Rouge Parish Police Jury;

45.     Bossier City, a political subdivision of the State of Louisiana;

46.     Town of Baldwin, a political subdivision of the State of Louisiana;

47.     Town of Berwick, a political subdivision of the State of Louisiana;

48.     Morgan City, a political subdivision of the State of Louisiana;

49.     City of Franklin, a political subdivision of the State of Louisiana;

50.     City of Patterson, a political subdivision of the State of Louisiana;

51.     City of New Iberia, a political subdivision of the State of Louisiana;

52.     City of Natchitoches, a political subdivision of the State of Louisiana;

53.     Kenner City, a political subdivision of the State of Louisiana;

54.     Susan Hutson, in her capacity of Sheriff o/b/o Orleans Parish Sheriff's Office;

55.     Joseph Lopinto, III, in his capacity as Sheriff o/b/o Jefferson Parish Sheriff's Office;

56.     Blaise Smith, in his capacity as Sheriff o/b/o St. Mary Parish Sheriff's Office;

57.     Rickey Jones, in his capacity as Sheriff o/b/o Tensas Parish Sheriff's Office;

58.     Greg Champagne, in his capacity as Sheriff o/b/o St. Charles Parish Sheriff's Office;

59.     David Hedrick, in his capacity as Sheriff o/b/o Concordia Parish Sheriff's Office;

60.     Toney Edwards, in his capacity as Sheriff o/b/o Catahoula Parish Sheriff's Office;

61.     St. Mary Parish School Board, a political subdivision of the State of Louisiana;

62.     Iberia Parish School Board, a political subdivision of the State of Louisiana;

63.     Benton Fire Protection District No. 4, a political subdivision of the State of Louisiana;

64.     Bossier Parish Emergency Medical Services Ambulance District, a political subdivision of the State of Louisiana;

65.     Red River Fire Protection District, a political subdivision of the State of Louisiana;

66.     Caddo Fire Protection District No. 1, a political subdivision of the State of Louisiana;

67.     Desoto Fire Protection District No. 8, a political subdivision of the State of Louisiana;

68.     West Baton Rouge Fire Protection District No. 1, a political subdivision of the State of Louisiana;

69.     St. Tammany Fire Protection District No. 1, a political subdivision of the State of Louisiana;

70.     St. Tammany Fire Protection District No. 2, a political subdivision of the State of Louisiana;

71.     St. Tammany Fire Protection District No. 3, a political subdivision of the State of Louisiana;

72.     St. Tammany Parish Fire Protection District No. 4, a political subdivision of the State of Louisiana;

73.     St. Tammany Parish Fire Protection District No. 5, a political subdivision of the State of Louisiana;

74.     St. Tammany Parish Fire Protection District No. 12, a political subdivision of the State of Louisiana;

75.     St. Tammany Parish Fire Protection District No. 13, a political subdivision of the State of Louisiana;

76.     A-MMED Ambulance, Inc., d/b/a A-Med Ambulance Service, a privately owned company, providing emergency ambulatory and medical services to the residents of Jefferson, Orleans, Plaquemines and Washington Parishes, in the State of Louisiana;

77.     North Caddo Hospital Service District, a political subdivision of the State of Louisiana;

78.     CLHG-Ruston, LLC, is a non-profit corporation organized under the laws of the State of Louisiana with its principal place of business in the City of Ruston, Lincoln Parish, Louisiana, that as a general acute care hospital provides medical care, therapeutic and prescription drug purchases, counseling and rehabilitation services;

79.     Louisiana Assessors Insurance Fund, also known as the Insurance Committee of the Assessors' Insurance Fund, is a public corporation established by and in accordance with La.

R.S. 47:1922 with its principal place of business in Baton Rouge, Louisiana. Louisiana Assessors Insurance Fund is self-funded and provides Louisiana assessors, assessors' employees, and dependents of the assessors and assessors' employees with group life and health benefits, including prescription drug benefits.

80.     The University System of Louisiana is a political subdivision or agency of the State of Louisiana, having been created in accordance with Article VIII Section 6 of the Constitution of Louisiana, and pursuant to La. R.S. 17:3217, who is composed of the institutions under its supervision and management including, but not limited to; Grambling State University at Grambling, Louisiana Tech University at Ruston, McNeese State University at Lake Charles, Nicholls State University at Thibodaux, Northwestern State University of Louisiana at Natchitoches, Southeastern Louisiana University at Hammond, The University of Louisiana at Lafayette, The University of Louisiana at Monroe, The University of New Orleans, along with all other colleges, universities, schools, institutions and/or programs also under its supervision.

81.     Board of Supervisors for Louisiana State University and Agricultural and Mechanical College is a political subdivision or agency of the State of Louisiana, having been created in accordance with Article VIII Section 7 of the Constitution of Louisiana, and pursuant to La. R.S. 17:3215, who is composed of the institutions under its supervision and management including, but not limited to:

> (A) Louisiana State University and Agricultural and Mechanical College, located at Baton Rouge and designated as the premier flagship university for the state;
> (B) Louisiana State University at Alexandria, located at Chambers;
> (C) Louisiana State University at Eunice; and
> (D) Louisiana State University at Shreveport.
> (E) Louisiana State University Health Sciences Center at New Orleans, which shall include medical and related health schools and programs located in New Orleans including those state's medical centers transferred to the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College as provided by

Louisiana law which includes but is not limited to the following hospitals, including all programs and facilities thereof:
    (i) Medical Center of Louisiana at New Orleans;
    (ii) Earl K. Long Medical Center in Baton Rouge;
    (iii) University Medical Center in Lafayette;
    (iv) Leonard J. Chabert Medical Center in Houma;
    (v) Lallie Kemp Regional Medical Center in Independence;
    (vi) Bogalusa Medical Center in Bogalusa;
    (vii) W.O. Moss Regional Medical Center in Lake Charles; and
    (viii) University Medical Center in Baton Rouge

(F) Louisiana State University Health Sciences Center at Shreveport, which shall include the medical school and related schools at Shreveport, Louisiana State University Hospital at Shreveport, E. A. Conway Medical Center at Monroe, and Huey P. Long Medical Center in Pineville.
(G) The Center for Agricultural Sciences and Rural Development which administers the agricultural extension and research programs of the board throughout the state. The center shall also be responsible for conducting river water research along with any other college, university, school, institution or program now or hereafter under the supervision and management of the Board.

## B. Defendants

82.    Plaintiff asserts claims against the following Defendants: McKinsey & Company, Inc.; McKinsey Holdings, Inc.; McKinsey & Company, Inc., United States; and McKinsey & Company, Inc. Washington D.C. (collectively "McKinsey").

83.    At all times relevant to this proceeding, the Defendants did business in Louisiana.

84.    The court has jurisdiction over the Defendants pursuant to La. R.S. § 51:1401 et seq. because McKinsey has transacted business within the state at all times relevant to this Complaint.

85.    Defendant McKinsey & Company, Inc. is a corporation organized under the laws of the state of New York. McKinsey's principal place of business is located at 711 Third Avenue, New York, NY 10017. It may be served with process via its registered agent, Corporation Service Company, at 80 State Street, Albany, NY 12207.

86.    Defendant McKinsey Holdings, Inc. is a Delaware corporation with its principal place of business located at 711 Third Avenue, New York, NY 10017. It may be served with process via its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

87.    Defendant McKinsey & Company, Inc. United States is a Delaware corporation with its principal place of business located at 711 Third Avenue, New York, NY 10017. It may be served with process via its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

88.    Defendant McKinsey & Company, Inc. Washington D.C. is a Delaware corporation with its principal place of business located at 711 Third Avenue, New York, NY 10017. It may be served with process via its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808. McKinsey & Company, Inc. Washington D.C. is registered to do business in Louisiana with a registered office and a registered agent for service of process.

89.    Upon information and belief, McKinsey & Company, Inc. is the parent company of McKinsey & Company Holdings, Inc., which is itself the parent company of both McKinsey & Company, Inc. United States and McKinsey & Company, Inc. Washington D.C. Upon information and belief, each subsidiary corporation is wholly-owned by its parent. Despite the corporate form, McKinsey began as a partnership and still refers to its senior employees as "partners." Those partners are the firm's shareholders. Collectively, these four Defendants are referenced throughout as "McKinsey."

90.    McKinsey a is global management consultancy with offices in over 130 cities in 65 countries, including the following United States cities: Atlanta, GA; Austin, TX; Houston, TX; Dallas, TX; San Francisco, CA; Los Angeles, CA; Redwood City, CA; Boston, MA; Charlotte,

NC; Chicago, IL; Cleveland, OH; Denver, CO; Detroit, MI; Miami, FL; Miramar, FL; Tampa, FL; Minneapolis, MN; Summit, NJ; New York, NY; Philadelphia, PA; Pittsburgh, PA; Seattle, WA; St. Louis, MO; Stamford, CT; Waltham, MA; and Washington, D.C.

91.     McKinsey is registered to do business in all fifty states, including Louisiana.

### JURISDICTION & VENUE

92.     This action *In Re: McKinsey & Co., Inc National Prescription Opiate Consultant Litigation*, MDL No. 2996, is filed directly in the Northern District of California as permitted in Paragraph 10 of this Court's Case Management Order dated November 30, 2021 (Doc. #293). But for the Initial Case Management Order permitting direct filing into the U.S. District Court, Northern District of California, this action would have been filed in the U.S District Court of the Middle District of Louisiana. Plaintiffs reserve the right to have this matter transferred to one or more U.S. District Courts for trial in which it could have originally filed this case.

93.     There is federal subject matter jurisdiction over this action because complete diversity exists among the parties, 28 U.S.C. § 1332. The parties are citizens of different states, and the amount in controversy, exclusive of interests or costs, exceeds the sum or value of $75,000. Federal subject matter jurisdiction is also present under 28 U.S.C. § 1331 because Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., raise a federal question. Further, the Court also has supplemental jurisdiction over the Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because the state law claims are part of the same case or controversy.

94.     Initial venue as to McKinsey is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise the claims of Plaintiffs occurred in the Middle District of Louisiana.

95.     The Court has personal jurisdiction over McKinsey under La. § R.S. 13:3201 because the causes of action alleged in this Complaint arise out of McKinsey's transacting business in Louisiana, contracting to supply services or goods in this State, causing tortious injury by an act or omission in this state, causing tortious injury in Louisiana and because McKinsey regularly does or solicit business or engaged in a persistent course of conduct or derived substantial revenue from goods used or consumed or services rendered in this State. McKinsey has purposefully directed its actions towards Louisiana and/or has the requisite minimum contacts with Louisiana to satisfy any statutory or constitutional requirements for personal jurisdiction.

96.     This action is unrelated to Purdue's pending bankruptcy proceedings. No relief is sought from Purdue herein. Rather, the only relief sought is from McKinsey. This action has no effect on the estate being administered in Purdue's bankruptcy or the handling and administration thereof, and does not affect Purdue's rights, liabilities, options or freedom of action.

## JURY DEMAND

97.     Plaintiffs demand a jury trial for all claims triable by jury.

**A.  McKinsey Uses Its Expertise in Marketing Strategies in the Pharmaceuticals and Opioids Industry to Deliver Results Desired by Opioid Makers.**

98.     McKinsey is a global consulting firm with many areas of expertise, including the pharmaceutical industry. As a management consulting firm, McKinsey provides advice to managers on how to run their companies or other enterprises. Management consultants have the ability to provide firms with specialized expertise or an outside perspective on its shortcomings that a company, focused on its core business, may lack.

99.     Today, McKinsey's website explains "How We Help Clients" in the pharmaceuticals industry: "Helping maximize commercial value by assisting with product launch, marketing, sales, and market access."

100.     McKinsey pitched its services to Purdue on the basis that it was able to "bring examples from other successful companies" and perform "detailed analytics."

101.     When Purdue entered into a "Master Consulting Agreement" with McKinsey in 2004, Purdue explicitly recognized "McKinsey has a fine reputation and excellent experience and relationships in our industry," which Purdue was counting on to boost its opioids business.

102.     McKinsey touted itself as being able to bring "additional capacity, horsepower, and industry experience to look at existing and new data in a way that wasn't done before. Indeed, it is when a client "has a problem that they cannot solve with their internal resources that's the most classic way that McKinsey is brought in."[11] McKinsey's strategies, and aid in implementing those strategies, do not come cheap. And, it stands to reason that profit-minded Purdue would not have paid McKinsey millions of dollars to help it achieve goals it could have obtained without that assistance.

103.     McKinsey is a highly selective employer and advertises that its employees join "for the opportunity to apply their talents to complex, important challenges."[12] "Talent" is key to McKinsey's model and a way McKinsey markets itself as able to add (financial) value to its clients. The McKinsey consultants who spearheaded McKinsey's engagement with Purdue are experts in the pharmaceutical industry. Rob Rosiello, had more than 30 years of experience in the pharmaceutical industry and, upon leaving McKinsey in 2015, became an executive at Valeant Pharmaceuticals. Arnab Ghatak is a medical doctor by training. Martin Elling is a leader in McKinsey's Pharmaceuticals and Medical Products Practice.

---

[11] How McKinsey Became One of the Most Powerful Companies in the World, CNBC, June 6, 2019 available at: https://www.youtube.com/watch?v=BBmmMj_maII.
[12] https://wwwmckinsey.com/about-us/overview.

104.    McKinsey also helped Janssen target its opioid marketing by identifying "priority growth opportunities" and growth strategies for Duragesic. In 2002, McKinsey considered "[w]hat are settings of care for opioid high-prescribers and treaters of back pain," listing the "elderly" as an example; McKinsey also considered how "data mining" might influence preferences for Duragesic. Evidence disclosed in an action by Oklahoma against Janssen's parent company, Johnson & Johnson, revealed McKinsey had taught Janssen to target younger patients, under 40 years old, as well.

105.    McKinsey does not simply give advice, however profitable its strategies may be. It espouses the idea of the "transformational relationship," arguing that real value for the client derives from this ongoing connection with the firm.[13] Although it may start with a discrete project, once ensconced in a company," such as Purdue, McKinsey may not leave, but rather ensure itself a steady and growing flow of billings for years, if not decades.[14]

106.    A core component of this relationship is discretion, as the individuals who worked with Purdue would have understood. McKinsey recognizes it must have its clients' trust and make confidentiality "paramount," as "[c]ompanies share their most competitive secrets with McKinsey" for McKinsey to do its work.[15]

107.    McKinsey can expect to learn these secrets because it is so deeply embedded in the client's organizational structure, with McKinsey employees working side by side with the client. As one McKinsey Senior Implementation Coach explained, McKinsey would interact "with every element of th[e] organization," from the employees on "on the front line, all the way up to the board of directors."[16] Another McKinsey consultant stated that in the "most successful

---

[13] Duff McDonald, The Firm, Pg. 136.
[14] *Id.*
[15] *Id.* at 308.
[16] McKinsey on Implementation, April 30, 2017, available at https://www.youtube.com/watch?v=rEQOGVpl9CY.

engagements" he had seen, "you can't even tell the difference between a McKinsey team member and one of our clients because we working that cohesively together."[17] As described below, McKinsey worked alongside Purdue in its effort to "turbocharge" opioid sales, building an approach around "ten work teams dedicated" to "help ensure a winning implementation" of the project, as well as to aid the salesforce to "significantly bolster OxyContin and Butrans sales and to improve Purdue's readiness for future launches." For one "major initiative" with Purdue, "McKinsey forecast[ed] a potential incremental increase in sales in the $200-400mm range" over a three-year period — "[w]hen properly implemented." Purdue hired McKinsey not only to give it advice, but to implement that advice down to the retail marketing level.

## B.  McKinsey Enjoyed a Long and Lucrative Relationship as Purdue's Outside Marketing Arm.

108.   Purdue is the manufacturer of OxyContin, among other opioids. OxyContin is a Schedule II opioid agonist[18] tablet of pure oxycodone first approved in 1995 and the product whose launch in 1996 ushered in the modern opioid epidemic. At the times relevant to this complaint, Purdue made it available in the following strengths: 10 mg, 15 mg, 20 mg, 30 mg, 40 mg, 60 mg, and 80 mg. The weakest OxyContin delivers as much narcotic as the strongest Percocet, and some OxyContin tablets delivered many times that. OxyContin is currently indicated for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate.

109.   Purdue is owned by members of the Sackler family and was for many years led by its Board Director and former President, Dr. Richard Sackler. Richard Sackler had grand ambitions

---

[17] *Id.* For McKinsey's own description of its implementation services, *See* https://www.mckinsey.com/business-functions/mckinsey-accelerate/how-we-help-clients/implementation.
[18] An opioid agonist is a drug that activates certain opioid receptors in the brain. An antagonist, by contrast, blocks the receptor and can also be used in pain relief or to counter the effect of an opioid overdose.

for the company; according to a long-time Purdue sales representative, "Richard really wanted Purdue to be big—I mean really big."[19] To meet that goal, and to continue selling amidst controversy and growing concern, especially after the 2007 guilty plea, Purdue, and the Sacklers, needed McKinsey's help.

110.    In 2004, after a ruling that held patents on OxyContin unenforceable due to Purdue misleading the patent office, McKinsey stepped in to help Purdue "protect [its] sales and continue to grow our business."

111.    On March 1, 2004, McKinsey entered into a "Master Consulting Agreement" with Purdue for "services that would be defined from time to time." The Agreement was signed by then-McKinsey Director Rob Rosiello."

112.    From 2004 through 2008, McKinsey advised Purdue on R&D, business development, and product licensing related to Purdue's opioid products. Consistent with their business model, McKinsey leveraged these projects into growth of its "Broader Strategy work" also underway with Purdue. Specifically, in October 2008, Purdue retained McKinsey for broad strategy work after two board members "blessed" Purdue executive Craig Landau with doing "whatever he thinks is necessary to 'save the business'" after the 2007 criminal plea and introduction of generic competition to the older OxyContin. As described below, Purdue relied heavily on McKinsey to help Purdue publicly portray itself as a good corporate citizen who could now be trusted and was even working on an "abuse-deterrent" or "ADF" form of OxyContin.

113.    Over their many years of working together, McKinsey and Richard Sackler, developed a close relationship. Indeed, one McKinsey partner, Maria Gordian, describes herself as a counselor to Richard Sackler in an "Ey 2009 Impact Summary."

---

[19] Christopher Glazek, The Secretive Family Making Billions from the Opioid Crisis, Esquire (Oct. 16, 2017), http://www.esquire.com/news-politics/a12775932/sackler-family-oxycontin/.

114.    Like Purdue, McKinsey was looking for growth. In a March 2009 self-assessment, Ms. Gordian described McKinsey's progress in having "continue[d] to expand the depth and breadth of [its] relationships with Purdue" and plans to "deepen[]" McKinsey's "relationship with the Sackler family," including by "serving them on key business development issues" and "expanding" McKinsey's relationship with members of Purdue's senior management team.

115.    By August 2009, Richard Sackler had convened a meeting of Board members and staff to discuss efforts to "reverse the decline in the OxyContin tablets market."

116.    During the 2009-2014 period in particular, Purdue relied extensively on McKinsey to develop its sales and marketing strategy for OxyContin. McKinsey worked closely with Purdue on both the creation and implementation of OxyContin sales strategy. McKinsey's work for Purdue included multiple facets of their business, including general and administrative consulting, review of product acquisition, evaluation of research and development, advising Purdue on the design of clinical studies, risk management, and product marketing.

117.    On May 28, 2013, McKinsey entered into a "Statement of Services to the Master Consulting Agreement" ("2013 Agreement") with Purdue to "conduct a rapid assessment of the underlying drivers of current OxyContin performance, identify key opportunities to increase near-term OxyContin revenue and develop plans to capture priority opportunities."[20] The 2013 Agreement stated "We have a long history of partnership with Purdue, and we would make best efforts to leverage our understanding of your business—both in terms of content and culture." The 2013 Agreement was signed by then-Principal Arnab Ghatak who would "lead the team with senior leadership from Rob Rosiello and Martin Elling."

---

[20] Quoted in Addendum to Purdue's 2020 Settlement Agreement with federal authorities.

118.    McKinsey continued to work with Purdue on strategies to boost the sales of its opioid products, in particular OxyContin, through 2017, when Purdue, which soon would be facing hundreds of lawsuits arising out if its role in the opioid epidemic, reduced its investment in sales.

119.    Even after the 2007 guilty plea, Purdue, with McKinsey's aid, saw growing profits from opioid sales. In 2015 alone, it obtained $ 3 billion in annual opioid sales — a four-fold increase from its 2006 sales of $800 million.

**C. After Purdue's 2007 Criminal Plea for Illegally Marketing OxyContin, McKinsey Created Strategies to Repair Purdue's Reputation and Boost Oxycontin Sales.**

**i.     McKinsey And Purdue Painted a Misleadingly Positive Portrait of Purdue to the FDA to Keep Selling Oxycontin.**

120.    As described above, in its 2007 criminal plea, Purdue acknowledged that it illegally marketed and promoted OxyContin by falsely claiming that OxyContin was less addictive, less subject to abuse and diversion, and less likely to cause withdrawal symptoms than other pain medications—all in an effort to maximize its profits.

121.    As described above, in its 2007 criminal plea, Purdue acknowledged that it illegally marketed and promoted OxyContin by falsely claiming that OxyContin was less addictive, less subject to abuse and diversion, and less likely to cause withdrawal symptoms than other pain medications—all in an effort to maximize its profits.

122.    McKinsey advised Purdue on how to approach the FDA in light of its criminal conviction and retain business in light of the reputational damage to the company and to OxyContin after the admissions in its guilty plea.

123.    In 2008, Purdue submitted a New Drug Application for a reformulation of OxyContin, ostensibly to make it more difficult to abuse by extracting the active ingredient from

it or otherwise defeating the time-release mechanism in OxyContin tablets — i.e. another product Purdue would later deceptively promote as safer than and less prone to abuse than it was.

124.    In June 2009, McKinsey helped Purdue prepare for an FDA Advisory Committee meeting. Among other recommendations, McKinsey advised that "we will need to be ready with the right messages." It also cautioned that that there was a perception of Purdue as "disingenuous, trying to expand the OxyContin market by reformulating" and as well as Purdue's ability to "explicitly quash[]" such concerns with assurances that this was not its intent.

125.    McKinsey prepared for Purdue an "FDA Advisory Committee on Reformulated OxyContin: Question & Answer Book" in September 2009, with questions including "Why should we trust you?" In response, McKinsey recommended Purdue say "We acknowledge mistakes made in the past[;]" "We have x, y and z measures in place that did not exist before[;]" and "[a]t all levels, Purdue's focus is on maintaining the highest ethical standards and meeting the needs of patients[.]" To the question of "Who at Purdue takes personal responsibility for all these deaths?[,]" McKinsey recommended Purdue say "We all feel responsible[.]"

126.    In 2009, the FDA noted in permitting ADF labeling that "the tamper-resistant properties will have no effect on abuse by the oral route (the most common mode of abuse)."

127.    In approving reformulated OxyContin, the FDA cautioned that the reformulation "is not completely tamper resistant and those intent on abusing this new formulation will likely find a means to do so. In addition, the product can still be misused or abused and result in overdose by simply administering or ingesting larger than recommended oral doses."

128.    Having advised Purdue on the design of tests of reformulated OxyContin as part of Purdue's FDA submission, McKinsey knew that reformulated OxyContin could still be abused.[21]

---

[21] McKinsey specifically advised Purdue on how to respond to questions raised at an FDA advisory committee, which noted a "determined abuser" could extract half of the active ingredient.

129.     Reformulated ADF OxyContin was approved by the FDA in April 2010, but it was not until 2013 that the FDA, in response to a citizen petition filed by Purdue, permitted reference to the abuse-deterrent properties in its label. Years earlier, in August 2010, however, Purdue discontinued the original version of OxyContin and began selling reformulated OxyContin. It is unlikely a coincidence that reformulated OxyContin was introduced shortly before generic versions of OxyContin were to become available, threatening to erode Purdue's market share and the price it could charge. Purdue nonetheless touted its introduction of reformulated OxyContin and another ADF opioid as evidence of its good corporate citizenship and commitment to protecting the public. Having successfully navigated the approval process, Purdue then proceeded to market the ADF version of OxyContin as a solution to opioid abuse and as a reason that doctors could continue to safely prescribe their opioids.

130.     Purdue was not a changed company, nor did it take responsibility for the harm it caused. Indeed, even in May 2019, Richard Sackler testified in a deposition that he and his colleagues on the Board "did not have a responsibility" to correct language suggesting OxyContin was less likely abused, professing ignorance on that matter.

ii.      **McKinsey Gave Purdue the Tools to Limit FDA Regulations to Mitigate the Risks of Opioid Use.**

131.     At the same time as it worked to rehabilitate Purdue's image with the FDA, McKinsey, in parallel, advised Purdue on how to limit FDA regulations aimed at mitigating the risks of opioid use. In 2008, shortly after Purdue's criminal plea, the FDA requested Purdue submit a proposed "Risk Evaluation and Mitigation Strategy" for OxyContin. McKinsey provided Purdue with drafts of the submission. In 2009, the FDA expanded its scope to a class-wide ER/LA REMS program.

132.    Purdue sought to avoid a requirement that prescribers undergo mandatory training on OxyContin's risks or management or obtain certification before prescribing OxyContin, which would limit the numbers of available prescribers. Purdue turned to McKinsey. McKinsey found the cost to Purdue of a system to verify completion of prescriber education before prescriptions could be filled would be $50 million—an estimate Purdue used to oppose efforts for more rigorous risk management strategies. A summary of McKinsey's work on REMS prepared by Purdue stated that the REMS Purdue and McKinsey developed for OxyContin would "preserv[e] patients' access," a euphemism meaning prescriptions would not be reduced, and that it positioned Purdue as a "leader," which it was then able to apply to class-wide REMS.

133.    Armed with McKinsey's analysis, Purdue's strategy on REMS was effective. The REMS program avoided verification and enrollment provisions that would harm Purdue's profits.

134.    Meanwhile, based on McKinsey's work on Extended Release Opioid REMS, McKinsey was aware of warnings and adverse events included within the OxyContin medication guide and communications plans, including risks of overdose and adverse events including dizziness and lethargy.

### iii.    McKinsey Developed a Plan to Turn Around OxyContin Sales through Deceptive Marketing Claims and Encouraging High Doses.

135.    In 2009, McKinsey provided multi-faceted advice to Purdue to turnaround recent volume and share decline in OxyContin.

### a.    Promoting Higher Doses Without Disclosing Increased Risks.

136.    McKinsey advised Purdue that although OxyContin prescriptions had indeed decreased, Purdue did not lose as much money from this due to a shift in OxyContin prescriptions towards higher dose pills. McKinsey recommended an approach to OxyContin marketing that emphasized and encouraged higher dose prescriptions by a smaller number of loyalist prescribers.

137.    It was, however, well known that higher doses of opioids carry greater risk. Patients receiving high doses of opioids (e.g., doses greater than 100 mg morphine equivalent dose ("MED") per day) as part of long-term opioid therapy are three to nine times more likely to suffer overdose from opioid-related causes than those on low doses. As compared to available alternative pain remedies, scholars have suggested that tolerance to the respiratory depressive effects of opioids develops at a slower rate than tolerance to opioids' analgesic effects. The United States Centers for Disease Control and Prevention also recognizes that higher doses of opioids tend to increase overdose risks relative to any potential patient benefit.[22]

138.    In an October 26, 2009 presentation, "OxyContin – driving growth through stronger brand loyalty," McKinsey proposed tactics to turnaround declining sales, "[e]nhance loyalty to OxyContin among loyalist prescribers," "convert[ing] 'fence sitters' into more loyal OxyContin prescribers," and "protect OxyContin's market share[.]" In other words, McKinsey proposed increasing sales by pushing both willing and reluctant physicians to prescribe more OxyContin.

139.    McKinsey recommended segmenting prescribers and tailoring messages and tactics to different segments. For prescribers dubbed "Early Adopting Experts" and "Proactive Teachers," defined by a willingness to use extended-release opioids, including in opioid naïve patients (patients who were not already using opioids), McKinsey urged emphasizing that its 7 tablet strengths provide flexibility to "tailor the dose" to customer needs. Upon information and belief, this message aimed to encourage prescribers to initiate and maintain patients on OxyContin long-term by reminding them they could increase the dose as patients became tolerant with long-term use (rather than discontinue use when the drug lost its effectiveness).

---

[22] Dowell D, Haegerich TM, Chou R. CDC Guideline for Prescribing Opioids for Chronic Pain — United States, 2016. MMWR Recomm Rep 2016;65(No. RR-1):1–49. DOI: http://dx.doi.org/10.15585/mmwr.rr6501e1.

140.    Claims that opioids could be taken in ever-increasing strengths to obtain pain relief, without disclosing that higher doses increased the risk of addiction and overdose are deceptive and misleading. They were particularly important to promotional efforts, however, because patients on opioids for more than a brief period develop tolerance, requiring increasingly high doses to achieve pain relief. Marketers needed to generate a comfort level among doctors to ensure the doctors maintain patients on the drugs even at the high doses that became necessary.

141.    Purdue adopted McKinsey's prescriber segmentation proposal. Further, many of the messages McKinsey urged appeared in OxyContin promotional materials from 2009-2012, including the "Conversion and Titration Guide," which included similar claims about "tailoring the dose."

142.    The messaging worked. Nationwide, based on an analysis by the Los Angeles Times, more than 52% of patients taking OxyContin longer than three months are on doses greater than 60 milligrams per day—which converts to the 90 MED that the CDC Guideline urges prescribers to "avoid" or "carefully justify."[23]

**b.  False Promises of Functional Improvement.**

143.    McKinsey recommended a strategy to target those prescribers who did not regularly prescribe OxyContin – so-called "Resigned Followers and ER Delayers," encouraging them to "increase step-up" to extended-release opioids. These were physicians with "low comfort with extended-release opioids. McKinsey encouraged Purdue to emphasize to them the "range of appropriate patients." In other words, McKinsey's strategy recommended that Purdue encourage these prescribers to use OxyContin earlier in a patient's treatment for a wider range of patients and for longer periods of time.

---

[23] CDC Guideline at 16.

144.    McKinsey stated that by highlighting the ability to "tailor the dose" and treat a "broad range of patients," the prescriber-takeaway would be that "physicians can help their patients function better and lead a fuller and more active life," even though this conclusion was not to be explicitly addressed."

145.    Upon information and belief, McKinsey knew better than to encourage the express message that OxyContin would improve patients' function, and relied instead on the implied "takeway." That it carefully crafted this deceptive message indicates understanding of the culpability of its conduct, rather than an innocent mistake.

146.    Claims that OxyContin improved function and quality of life were not supported by substantial evidence and, in addition, failed to take into account risks of addiction. As a pain specialist noted in an article titled "Are We Making Pain Patients Worse?": "[O]pioids may work acceptably well for a while, but over the long term, function generally declines, as does general health, mental health, and social functioning. Over time, even high doses of potent opioids often fail to control pain, and these patients are unable to function normally." A 2006 study-of-studies found that opioids as a class did not demonstrate improvement in functional outcomes over other non-addicting treatments. Most notably, it stated: "For functional outcomes, the other analgesics were significantly more effective than were opioids."[24]

147.    The FDA and other federal agencies have, for years, made clear the lack of evidence for claims that the use of opioids for chronic pain improves patients' function and quality of life.[25]

_____

[24] Andrea D. Furlan et al., Opioids for chronic noncancer pain: a meta-analysis of effectiveness and side effects, 174(11) Can. Med. Ass'n J. 1589 (2006). This same study revealed that efficacy studies do not typically include data on opioid addiction. In many cases, patients who may be more prone to addiction are pre-screened out of the study pool. This does not reflect how doctors actually prescribe the drugs, because even patients who have past or active substance use disorders tend to receive higher doses of opioids. Karen H. Seal, Association of Mental Health Disorders With Prescription Opioids and High-Risk Opioids in US Veterans of Iraq and Afghanistan, 307(9) J. Am. Med. Ass'n 940 (2012).

[25] The FDA has warned other drug makers that claims of improved function and quality of life were misleading. See Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Commc'ns, to Doug Boothe, CEO, Actavis

The CDC Guideline, following a "systematic review of the best available evidence," concluded that "[w]hile benefits for pain relief, function and quality of life with long-term opioid use for chronic pain are uncertain, risks associated with long-term opioid use are clearer and significant."[26] According to the CDC director, "for the vast majority of patients, the known, serious, and too-often-fatal risks far outweigh the unproven and transient benefits [of opioids for chronic pain]."[27]

### c. Promoting "Convenience" of 12-Hour Dosing.

148.    McKinsey also urged messages concerning the "convenience of q12h dosing," even though it was well-known in the pain treatment field that the analgesic effect of OxyContin wore off after eight to ten hours in many patients. This was not a new message, but one Purdue had tried before, even though it knew the drug did not last 12 hours in many patients. Additionally, the FDA found in 2008, in response to a Citizen Petition by the Connecticut Attorney General, that a "substantial proportion" of chronic pain patients taking OxyContin experienced "end of dose failure"—i.e., little or no pain relief at the end of the dosing period.

149.    End-of-dose failure renders OxyContin even more dangerous because patients begin to experience withdrawal symptoms, followed by a euphoric rush with their next dose—a cycle that fuels a craving for OxyContin. For this reason, Dr. Theodore Cicero, a neuropharmacologist at the Washington University School of Medicine in St. Louis, has called OxyContin's 12-hour dosing "the perfect recipe for addiction."[28] Many patients will exacerbate

---

Elizabeth LLC (Feb. 18, 2010) (rejecting claims that Actavis' opioid, Kadian, had an "overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."); Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Commc'ns, to Brian A. Markison, Chairman, President and Chief Executive Officer, King Pharmaceuticals, Inc. (March 24, 2008) (finding the claim that "patients who are treated with [Avinza (morphine sulfate ER)] experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."). The FDA's warning letters were available to McKinsey on the FDA website.

[26] CDC Guideline at 2, 18.

[27] Thomas R. Frieden and Debra Houry, New England Journal of Medicine, "Reducing the Risks of Relief—The CDC Opioid-Prescribing Guideline" at 1503 (Apr. 21, 2016).

[28] Harriet Ryan, "'You Want a Description of Hell?' OxyContin's 12-Hour Problem," supra Note 4.

this cycle by taking their next dose ahead of schedule or resorting to a rescue dose of another opioid, increasing the overall amount of opioids they are taking. Promotion of 12-hour dosing, without disclosing its limitations, is misleading because it implies that the pain relief supplied by each dose lasts 12 hours.

150.   McKinsey, however, evidently recognized messages concerning the dosing as key to OxyContin's market dominance and high price.

**D.  McKinsey Developed the "Evolve to Excellence" Initiative to "Turbocharge" OxyContin Sales Focusing on High-Volume Prescribers.**

151.   OxyContin sales declined after the release of reformulated OxyContin, despite Purdue's promotional efforts, and continued to decline in 2012 and early 2013.

152.   As a result, Purdue again turned to McKinsey to fix its OxyContin sales problem. McKinsey entered into the 2013 Agreement with Purdue to "conduct a rapid assessment of the underlying drivers of current OxyContin performance, identify key opportunities to increase near-term OxyContin revenue and develop plans to capture priority opportunities." McKinsey understood that "current OxyContin performance" was "OxyContin 2012 and early 2013 performance is below forecast and [Purdue's] shared aspirations."

153.   McKinsey was tasked with "Identifying Granular Growth Opportunities for OxyContin," conducting an "assessment of the underlying drivers of current OxyContin performance," identifying "key opportunities to drive near-term OxyContin performance," and developing "plans to capture priority opportunities."

154.   For purposes of the project, McKinsey would need "[f]ull access to work done to date and key data." And, Purdue shared with McKinsey its physician-level sales and targeting data in order for McKinsey to develop a marketing strategy.

155.     McKinsey attributed the decline in sales in part to reformulation. McKinsey's work also considered "DEA actions, negative media/prop," and "sales force execution" among other factors.

156.     Although reformulated OxyContin could still be readily abused by those who became addicted to it, perception of the drug could still lead to a shift to other opioids by those intending to obtain them for non-medical purposes. In other words, OxyContin was less attractive to unethical prescribers and on-medical users because it was harder to tamper with to allow it be snorted or injected – or less desirable for an illicit market of those selling or abusing the product.[29] That is why, in finally identifying potential pill mill prescribers in support of its application for a tamper-resistant indication for OxyContin, Purdue focused on prescribers whose sales of OxyContin had declined dramatically after the reformulation;[30] it knew that those who stopped prescribing OxyContin after the reformulation were likely have been prescribing it illicitly, for abuse and diversion.

157.     Nevertheless, McKinsey, having thoroughly studied Purdue's reformulation, the FDA's ER/LA REMS, and Purdue's sales strategy, prescribers, and potential prescribers, proposed that Purdue "turbocharge" OxyContin sales by intensifying its marketing efforts on the highest-volume prescribers, without addressing whether those prescribers may be engaged in abuse and diversion. It is well known that one key red flag of potential diversion is the volume of opioids prescribed, particularly relative to the prescriber's area of specialty. The first bullet point of Purdue's 2007 "Observations and Activities Requiring an [Abuse, Diversion, and Detection]

---

[29] A 2013 article presented by Purdue employees based on review of data from poison control centers, concluded that ADF OxyContin can reduce abuse, but that this abuse merely shifted to other drugs and that, when the actual incidence of harmful exposures was calculated, there were more harmful exposures to opioids (including heroin) after the reformulation of OxyContin.
[30] https://www.accessdata.fda.gov/drugsatfda_docs/nda/2013/022272Orig1s014ODMemo.pdf at 8.

Report" was "[a]n apparent pattern of an excessive number of patients for the practice type[.]" Thus, McKinsey knew or should have known that there was a higher risk of abuse and diversion among high-volume prescribers.

158.    Though it focused on expanding the volume of the highest-risk prescribers, McKinsey's proposal was later referred to, without irony, as the "Evolve to Excellence" initiative or "E2E."

159.    McKinsey found that Purdue did not "focus on the highest potential docs," measured both by the number of prescriptions and reimbursement considerations. One McKinsey analyst urged McKinsey to recommend Purdue target "[l]iterally, at least all" prescribers in the top 20% of prescribers, "minus another few percent who are no sees[.]" McKinsey team lead Arnab Ghatak replied that "they probably have 20% no see[], but i'd also assume there are not many high writers that are no see." ("No see" prescribers are prescribers who do not accept visits from pharmaceutical sales representatives. Thus, upon information and belief, McKinsey recognized that most of the highest volume prescribers, or "high writers" of prescriptions, were willing to entertain sales visits from sales representatives.)

160.    As described above, one of the services McKinsey touted for Purdue concerned the use of data to help Purdue meet its goals. McKinsey's analysis for the "E2E" proposal shows that it had detailed information from which it could discern, as could Purdue, whether a prescriber had problematic patterns suggesting operation as a "pill mill" — including a shift to other opioids after OxyContin's reformulation. Yet, McKinsey urged Purdue to target, and seek to increase the prescribing of, all of these prescribers from whom it perceived Purdue could obtain greater profits.

161.    Given the number of employees McKinsey had engaged in confidential communications with Purdue, it is possible McKinsey knew that, internally, a Purdue sales

manager informed her supervisors in 2009 about a suspected pill mill in Los Angeles. The employee reported over email that when she visited the clinic with her sales representative, "it was packed with a line out the door, with people who looked like gang members," and that she felt "very certain that this an organized drug ring[.]"[31] She wrote, "This is clearly diversion. Shouldn't the DEA be contacted about this?" Her supervisor at Purdue, however, responded that while they were "considering all angles," it was "really up to [the wholesaler] to make the report."[32] This pill mill was the source of 1.1 million pills trafficked from California to Everett, Washington, a city of around 100,000 people. Purdue waited until after the clinic was shut down in 2010 to inform the authorities. Later, in 2016, the L.A. Times ran a story detailing this conduct, which would have been available to McKinsey.

162.    As part of Project Turbocharge, McKinsey concluded that there existed a "significant opportunity to improve sales through better targeting."

163.    "Better targeting" meant focusing sales calls on extremely high-volume opioid prescribers. "To put this in perspective," McKinsey stated, "the average prescriber in decile 5-10 [the top half of prescribers by volume] writes 25x as many OC scripts as a prescriber in decile 0-4. In Q1 2013 the majority (52%) of OxyContin primary calls were made to decile 0-4 prescribers. Including the secondary calls, 57% of the primary detail equivalents (PDEs) were made to decile 0-4 prescribers. Best practice in the industry is over 80% of effort on higher value prescribers." McKinsey concluded: "Given that there are 14,000 uncalled physicians in deciles 5-10, there is significant opportunity to shift calls to higher potential prescribers."

---

[31] Harriet Ryan et al., More Than 1 Million OxyContin Pills Ended Up in the Hands of Criminals and Addicts. What the Drugmaker Knew, Los Angeles Time (July 10, 2016), http://www.latimes.com/projects/la-me-oxycontin-part2/.
[32] Id.

164.    "Better targeting" also meant removing sales representative discretion with respect to call plans. McKinsey explained that "it appears that the degree of flexibility may be allowing the field to trade off higher value prescribers for lower ones. Purdue should re-evaluate the optimal degree of freedom, which in turn could enable greater capture of benefits from adjustments to reach and targeting."

165.    To slow or reverse the decline in OxyContin sales, McKinsey recommended a shift to "value deciles," which purported to weight prescribers according to factors including overall opioid prescriptions, including the number of branded versus generic prescriptions; prescriber rules in place limiting sales calls; managed care access; and the number of the prescribers new to brand prescriptions, including new opioid patients and switches from other opioid products. The cumulative effect of the value rankings was to shift detailer emphasis onto the highest-volume prescribers. Further, McKinsey's analysis found that the highest-volume prescribers were themselves most influenced by detail visits.

166.    The core objective of McKinsey's E2E initiative, also known as "Turbocharging the Sales Engine" or "Project Turbocharge," was to ensure that Purdue was "making calls on the highest potential customers with the right frequency to maximize prescribing potential."

167.    McKinsey's "turbocharging" plan also had other elements. Overall, it would be a "transformative journey" to "[i]ncrease [sales representative] productivity on OxyContin and explore ways to increase time in the field" as well as consider incentive compensation changes to "match OxyContin prioritization." In that regard, incentive compensation would also be "revise[d] . . . to align with front line initiatives and sales targets."

168.    Meanwhile, McKinsey would have understood from its ongoing relationship, including prior work and review of Purdue's materials for purposes of this plan, that the prescribers

targeted by this effort to increase sales would be receiving Purdue's deceptive messages downplaying the risks of opioids and overstating their benefits.

169.    Purdue, like McKinsey, recognized that the initiative was no small thing. An internal Purdue email states that "much of this will be transformational in nature and require significant effort to develop, implement and fully execute on."

170.    McKinsey asked Purdue's Board to "make a clear go-no go decision to 'Turbocharge the Sales Engine,'" meaning implementing McKinsey's plan.

171.    Purdue's Board, especially members of the Sackler family, were "extremely supportive" of McKinsey's recommendations to target high prescribers, and gave a "ringing endorsement" of "moving forward fast."

172.    Both Purdue and McKinsey worked together to implement "Turbocharging the Sales Engine. Purdue's OxyContin brand team modified the "Individualize the Dose" Core Visual Aid used in detail visits to "be more in line with the recommendations provided by the McKinsey Report," including emphasis on "dosage adjustment," i.e., encouraging high prescribing.

173.    McKinsey and Purdue also worked together on an "implementation plan" for E2E, with McKinsey taking on the role of "executive oversight" of projects including the creation of target lists, internal dashboards to track progress, and changes to Purdue's incentive compensation plan consistent with E2E.

**E. McKinsey's Turbocharging Program Successfully Increased Purdue's Profits, and Opioid Sales, Through Deceptive Marketing and Turning a Blind Eye to Potential Diversion.**

174.    The "Turbocharging" program was successful for Purdue and McKinsey. Purdue's CEO John Stewart noted in an email to board member Dr. Kathe Sackler in December 2013 that "trends are more positive than was the case a few months back, and when the E2E Project (the

changes arising out of the McKinsey analysis) is fully implemented there will certainly be additional increases."

175.    Later that month, Purdue Chief Financial Officer Ed Mahony reported that Project Turbocharge was already showing positive results. All sales representatives received a memo on December 23, 2013, identifying how to select "SuperCore" prescribers, or the top 10 targets, in their territory according to the E2E high prescribing principles and required that each SuperCore prescriber be visited at least twice a month. In January 2014, Purdue approved the E2E target programs at a meeting with McKinsey consultants present, including requiring a minimum of three calls per day of prescribers in the "SuperCore/Core" categories. As part of these changes, McKinsey's plan involved more minimum sales calls overall.

176.    By 2014, Purdue had an additional $71 million in sales as a result of Project Turbocharge, and Mahoney reported to the Board that the effort "has resulted in significant improvement." A July 2014 analysis found that of the 200 prescribers who most increased prescriptions, 190 were targeted under E2E.

177.    In 2017, McKinsey "disassembled" Purdue's sales force when Purdue's then-CEO Craig Landau acknowledged that "too many Rxs [were] being written" at "too high a dose" and "for too long," for "conditions that don't require them," and by prescribers who did not have "the requisite training in how to do them appropriately." McKinsey was a party to all these problems—having advised Purdue from 2008 to 2013 to sell more opioids, to sell higher dose opioids, and to sell opioids to higher volume prescribers at greater risk of abuse and diversion, and having helped Purdue avoid mandatory prescriber education about the risks of opioids. Landau noted the sales force's disassembly represented "the changes we should have done 5 years ago"—or before McKinsey in 2013 recommended turbocharging OxyContin sales through the E2E initiative.

178.   Project Turbocharge targeted for increased visits prescribers who should have raised red flags of potential diversion.

179.   Dr. Kaniz Khan-Jaffrey of Abescon, New Jersey, a neurologist in Decile 10, increased his prescribing of OxyContin by nearly 40% under E2E. In 2018, the DEA issued an Order to Show Cause and Immediate Suspension Order to Dr. Khan-Jaffrey over concerns her DEA registration "constituted an immediate danger to the public health and safety," finding she prescribed opioids without a legitimate medical purpose and disregarded urine screens indicating abuse and diversion.[33] Dr. Khan-Jaffrey's DEA registration was fully revoked on July 28, 2020.[34] Dr. Louis Spagnoletti, of Marlton, New Jersey, another decile 10 prescriber who increased his prescribing by 40% from lost his state license to prescribe controlled substances in 2018. Similarly, Dr. Vivienne Matalon, a Decile 10 prescriber from Cherry Hill, New Jersey, whose prescribing increased more than 300%, went on to lose her license in 2018 as well, for allegedly receiving kickbacks to prescribe the fentanyl drug Subsys to three patients, one including one that died. Another prescriber, Dr. Damon Cary of Wilmington, Delaware, a Decile 9 prescriber whose OxyContin prescriptions more than doubled under E2E, received an emergency suspension order in 2019 after prescribing controlled substances, including opioids, to undercover officers without performing any medical examinations. Dr. Eva Dickinson, of Harrington, Delaware, a Decile 10 prescriber, whose prescriptions of OxyContin increased over 20% under E2E, was arrested on marijuana charges in 2016 and had her license suspended in 2017 for sharing drugs, including opioids, with her patients. Dr. Michael Cozzi of Fort Wayne, Indiana, a Decile 10 prescriber, whose prescriptions of OxyContin increased by over 400% under E2E, had his medical license suspended in 2016, where he had prescribed more controlled substances than any other Indiana

---

[33] https://wwwfederalregister.gov/documents/2020/07/29/2020-16387/kaniz-f-khan-jaffery-md-decision-and-order.
[34] *Id.*

prescriber, with over 2 million doses of oxycodone, reportedly seeing 90-100 patients a day. Dr. Jamie Gurrero, a Decile 10 prescriber from Jeffersonville, Indiana, whose OxyContin's prescriptions increased by more than 25% under E2E was sentenced to 100 months in prison in 2016 after pleading guilty to "unlawful distribution or dispensing of controlled substances, health care fraud, conspiracy, and money laundering."[35]

180.    In its 2020 criminal plea, Purdue acknowledged that from 2007 through February 2018, it failed to maintain effective controls against diversion of OxyContin by failing to report and provide complete information to the DEA of prescribers its internal anti-diversion programs indicated should have been placed on Purdue's Region Zero or no-call list. In some cases, Purdue continued to visit, or "detail" these prescribers, to encourage them to prescribe Purdue opioids or to provide them with savings cards that would reduce patient co-pays or other costs. As part of the 2020 plea, the parties agreed to a criminal fine in the amount of $3.544 billion and a forfeiture judgment in the amount of $2 billion.[36]

181.    Troublingly, a number of the prescribers targeted by McKinsey's Project Turbocharge are nurse practitioners or family doctors. Misrepresentations to these prescribers were especially insidious because they were aimed at general practitioners who lack the time and expertise to closely manage higher-risk patients on opioids.

**F.  McKinsey's Turbocharging Initiative Also Advised Purdue to Circumvent Increased Safeguards on Abuse and Division of OxyContin.**

---

[35] https://www.justice.gov/usao-wdky/pr/kentuckiana-anesthesiologist-sentenced-100-months-unlawful-distribution-controlled

[36] Earlier, in August of 2015, Purdue entered into an Assurance of Discontinuance disclosed that the New York Attorney General had found that Purdue placed 103 New York health care providers on its No-Call List between January 1, 2008 and March 7, 2015, and that Purdue's sales representatives had detailed approximately two-thirds of these providers, some quite extensively, making more than a total of 1,800 sales calls to their offices over a six-year period . . . ." Attorney General of the State of New York, In the Matter of Purdue Pharma L.P., Assurance No.: 15-151, Assurance of Discontinuance Under Executive Law Section 63, Subdivision 15 at 5. That document is publicly available online.

182.    In its August 8, 2013 Board report, McKinsey also attributed the decline in OxyContin sales to safeguards to limit suspicious opioid sales. McKinsey informed Purdue that "[t]he retail channel, both pharmacies and distributors, is under intense scrutiny and direct risk." "There are reports of wholesalers stopping shipments entirely to an increasing number of pharmacies," "[m]any wholesalers are also imposing hard quantity limits on orders based on prior purchase levels," and "[p]harmacy chains are implementing guidelines for which patients can fill opioid prescriptions[.]" McKinsey advised that "deep examination of Purdue's available pharmacy purchasing data shows that Walgreens has reduced its units by 18%." McKinsey urged Purdue's leadership to lobby Walgreens' "senior level" leaders to loosen restrictions, imposed in the wake of DEA action against the chain. Later, McKinsey would observe that following a decline corresponding with Walgreens's "Good Faith Dispensing" implementation, from December 2013 to March 2014, Walgreens monthly purchasing had increased 8%.

183.    McKinsey's E2E initiative also included ways to circumvent these safeguards. McKinsey recommended that the sales force distribute vouchers and "starter kits" for patients who faced co-pays for OxyContin prescriptions. In particular, McKinsey recommended dispensing vouchers to outlets of a specific large national pharmacy chain where prescriptions and OxyContin inventories were down. This chain, as part of its own settlement with the U.S. Drug Enforcement Administration, had removed pharmacist bonuses for dispensing opioids.

## G. McKinsey Knew OxyContin Was Highly Abusable, Addictive, and Dangerous and that Its Marketing Strategies Thus Increased These Dangers.

184.    McKinsey knew that OxyContin was highly abusable, addictive, and dangerous at all times it worked with Purdue from 2008 to 2013 to boost sales of OxyContin, encourage sales of higher doses of OxyContin, and target the highest-volume opioids prescribers.

185.    McKinsey was well aware of the risks of OxyContin based on its extensive experience in the pharmaceutical industry, close collaboration with Purdue, and participation in the regulatory submissions for reformulated OxyContin.

186.    In an August 2017 presentation, McKinsey recognized that the opioid epidemic was "triggered, in large part, by a massive increase in prescribed opioids in the early 2000's."

187.    McKinsey knew that the original OxyContin was widely abused and that post-reformulation, many former OxyContin users migrated to heroin.

188.    McKinsey also knew that reformulated OxyContin was still subject to abuse, having worked on the submission for the reformulated product. Indeed, in 2011, post-reformulation, McKinsey proposed that Janssen, another opioid manufacturer client, differentiate its Nucynta opioid from OxyContin on the basis of prescribers' concerns about OxyContin's abuse liability.

**H. McKinsey, Like Purdue, Attempted to Portray Itself as Part of the Solution While Concealing Its Role in the Opioid Epidemic.**

189.    McKinsey's work on the other side of the aisle—helping clients address opioid abuse and addiction—further proves that it was well aware of the risks of OxyContin, and thus the risks of pushing OxyContin sales and high dose sales, and targeting the highest-volume prescribers. McKinsey advised Purdue on "Project Tango," a 2014 plan to enter the addiction drug market. McKinsey noted the "addiction market" reached the billions and advised that "Purdue is uniquely positioned to overcome the underlying barriers to treatment[.]"

190.    In August 2017, McKinsey prepared a presentation entitled "Perspectives on Combatting the Opioid Crisis," which referenced its work on combatting opioid addiction for various other entities:

**RECENT CLIENT EXPERIENCE**

》 Designed and helped launch a health home program to expand resources and accountability for **substance abuse treatment**

》 Conducted a **state wide assessment of opioid prescriber performance** in terms of prescribing rate, dosage, and duration

》 Defined clinically relevant opioid quality measures for a **portfolio of episodes-of-care**

》 Defined clinically relevant opioid quality measures for a **Patient Centered Medical Home and Accountable Care Organizations**

》 Used predictive analytics to develop multi-faceted approach to **assess patient risk** for opioid addiction

》 Used geo-spatial and social network analytics to **assess intensity of opioid abuse and treatment needs**

》 Integrated claims and PDMP data to **generate transparency on provider prescribing practices**

》 Developed a **substance abuse episode of care** focused on priority patient journeys

191.    In June 2018, McKinsey published a public report, "Ten insights on the Opioid crisis from claims data analysis," stating information about the risks of opioids that McKinsey knew while advising Purdue to sell more opioids and higher dose opioids, and target the highest-volume prescribers:

    a.  "[P]roviders frequently prescribe opioids to patients with known or potential risk factors for abuse[;]"

    b.  Approximately 35% of the patients given opioid prescriptions in our analysis had features that put them at increased risk for opioid abuse[;]"

    c.  Most opioids are prescribed by providers other than the natural 'quarterback' of a patient's underlying complaint or condition." … "This finding makes clear that high-dose prescribers and multi-prescriber patterns are separate issues—and both are important to address[;]" and

    d.   "[A] small portion of opioid use originates in emergency departments"[37]

192.    Meanwhile, McKinsey had been using its data analytics for a different purpose as well. McKinsey knew that high dose OyxContin prescriptions carried a serious risk of overdose. In 2017, over half of Purdue's opioids prescriptions exceeded the 90 mg morphine equivalence threshold a day – the recommended maximal dose per the 2016 CDC Guideline for Prescribing Opioids for Chronic Pain. In November 2017, McKinsey recommended to Purdue ways to circumvent programs and initiatives by third party payors and other stakeholders to reduce opioid overdoses, which threatened Purdue's reliance on high dose OxyContin prescriptions. This presentation to Purdue, "High impact interventions to rapidly address market access challenges," recommended that Purdue treat OxyContin overdoses as a cost of doing business and offer to pay rebates for prescriptions above MME limits as well as rebates per OUD/OD incident."

193.    McKinsey provided estimates for the future costs of these "events" (which it defined as the "first occurrence for overdose or opioid use disorder"). McKinsey noted that, if Purdue were to start making overdose payments, it would "need to determine which payment amount is optimal," and suggested a "meaningful" amount, which, according to McKinsey, would be somewhere between six and fifteen thousand dollars for each person who overdoses or develops opioid-use disorder as a result of Purdue's drugs.

194.    McKinsey proposed a rebate of $7,000 per overdose:

---

[37] https://wwwmckinsey.com/industries/healthcare-systems-and-services/our-insights/ten-insights-on-the-us-opioid-crisis-from-claims-data-analysis.



195.    McKinsey's analysis also suggested that it could predict the number of people who would become addicted to opioids or overdose on pills sold through Purdue's downstream customers. McKinsey "projected that in 2019, for example, 2,484 CVS customers would either have an overdose or develop an opioid use disorder."[38]

196.    Just months after proposing such payments to Purdue, in July of 2018, Martin Elling of McKinsey wrote to Arnab Ghatak regarding lawsuits naming a Purdue outside director as a defendant, recommending that they "have a quick conversation with the risk committee to see if we should be doing anything other than eliminating all our documents and emails."

---

[38] Walt Bogdanich and Michael Forsythe, McKinsey Proposed Paying Pharmacy Companies Rebates for OxyContin Overdoses, N.Y. Times (Nov. 27, 2020, updated Dec. 17, 2020), https://wwwnytimes.com/2020/11/27/business/mckinsey-purdue-oxycontin-opioids.html.

---

Message
_____

From:       Martin Elling [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
            (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6B33C3264F744B04AF05FA59341271BE-MARTIN ELLI]
Sent:       7/4/2018 12:10:13 PM
To:         A G [drarnabghatak@gmail.com]
Subject:    Re: [EXT]Re: Howdy


Have a great fourth.  M

> On Jul 4, 2018, at 2:01 PM, A G <drarnabghatak@gmail.com> wrote:
>
> Thanks for the heads up.  Will do.
>
>> On Jul 4, 2018, at 7:57 AM, Martin Elling <martin_elling@mckinsey.com> wrote:
>>
>> Just saw in the FT that Judy Lewent is being sued by states attorneys general for her role on the
Purdue Board.  It probably makes sense to have a quick conversation with the risk committee to see if we
should be doing anything other that eliminating all our documents and emails.  Suspect not but as things
get tougher there someone might turn to us.  M
>>

As reflected in the e-mails, their concern at this time was protecting McKinsey, not helping victims of their marketing plans. Upon information and belief, McKinsey undertook efforts to conceal its participation in unfair and deceptive marketing by destroying electronic and physical files.

197.    McKinsey announced in 2019 that it "would not advise any clients worldwide on opioid-specific business."[39]

## I.  By Increasing Opioid Prescriptions and Use, McKinsey Fueled the Opioid Epidemic Alongside its Clients.

198.    The deceptive marketing strategies McKinsey developed and helped to implement worked, as described above. Deceptive marketing, including marketing McKinsey worked to develop and implement, substantially contributed to an explosion in the use of opioids across the country. Approximately 20% of the population between the ages of 30 and 44, and nearly 30% of the population over 45, have used opioids. Opioids are the most common treatment for chronic pain, and 20% of office visits now include the prescription of an opioid.

---

[39] Walt Bogdanich and Michael Forsythe, McKinsey Proposed Paying Pharmacy Companies Rebates for OxyContin Overdoses, N.Y. Times (Nov. 27, 2020), https://www.nytimes.com/2020/11/27/business/mckinsey-purdue-oxycontin-opioids.html.

199.    Studies have concurred with McKinsey's conclusions that detailing is effective. Numerous studies indicate that marketing impacts prescribing habits, with face-to-face detailing having the greatest influence.

200.    In particular, the effects of sales calls on prescribers' behavior is well-documented in the literature, including a 2009 study correlating the nearly ten-fold increase in OxyContin prescriptions between 1997 and 2002 to Purdue's doubling of its sales force and trebling its sales calls.[40] A 2017 study found that physicians ordered fewer promoted brand-name medications and prescribed more cost-effective generic versions if they worked in hospitals that instituted rules about when and how pharmaceutical sales representatives were allowed to detail prescribers.[41] The changes in prescribing behavior appeared strongest at hospitals that implemented the strictest detailing policies and included enforcement measures. Another study involved the research of four different practices which included visits by sales representatives, medical journal advertisements, direct-to-consumer advertising, and pricing, and found that sales representatives have the strongest effect on driving drug utilization. An additional study found that doctor meetings with sales representatives are related to changes in doctor prescribing practices and requests by physicians to add the drugs to hospitals' formularies.

201.    At the time McKinsey engaged in the misconduct described in this Complaint, the addictive potential of prescription opioids and the need for restraint in their use was widely understood, as was the likelihood of large-scale opioid addiction, abuse, overdoses, illness, and early death resulting from sharply increased use.

---

[40] Art Van Zee, The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy, 99 Am. J. Pub. Health 221–227 (2009).
[41] Ian Larkin et al., Association Between Academic Medical Center Pharmaceutical Detailing Policies and Physician Prescribing, 317 J. Am. Med. Ass'n 1785 (2017).

202.    In fact, the Supreme Court has observed the obvious potential for marketing campaigns for controlled substances to foster black markets. See also Direct Sales Co., 319 U.S. 703, 712 (1943) ("Mass advertising and bargain counter discounts are not appropriate to commodities so surrounded with restrictions. They do not create new legal demand and new classes of legitimate patrons, as they do for sugar, tobacco, and other free commodities. Beyond narrow limits, the normal legal market for opiates is not capable of being extended by such methods. The primary effect is rather to create black markets for dope and to increase illegal demand and consumption.").

203.    Representing the NIH's National Institute of Drug Abuse in hearings before the Senate Caucus on International Narcotics Control in May 2014, Dr. Nora Volkow explained that "aggressive marketing by pharmaceutical companies" is "likely to have contributed to the severity of the current prescription drug abuse problem."[42]

204.    In August 2016, U.S. Surgeon General Vivek Murthy published an open letter to physicians nationwide, enlisting their help in combating this "urgent health crisis" and linking that crisis to deceptive marketing. He wrote that the push to aggressively treat pain, and the "devastating" results that followed, had "coincided with heavy marketing to doctors . . . . [m]any of [whom] were even taught—incorrectly—that opioids are not addictive when prescribed for legitimate pain."[43]

205.    Compounding the harms from deceptive marketing, McKinsey's strategy, and implementation, also expanded Purdue's role in supplying opioids beyond even what an expanded market could bear, even seeking to increase the sales from prescribers who would have raised red

---

[42] "America's Addiction to Opioids: Heroin and Prescription Drug Abuse," Senate Caucus on Int'l Narcotics Control, hr'g, Testimony of Dr. Nora Volkow (May 14, 2014) available at http://www.drugcaucus.senate.gov/sites/default/files/Volkow%20Testimony.pdf.
[43] See n.7, supra.

flags of potential diversion, and profiting from Purdue's role in funneling opioids into Louisiana, and Plaintiffs' communities, beyond what any legitimate market, even an expanded market for chronic pain, could bear.

206.    McKinsey performed its own research in evaluating the anticipated effects of Project Turbocharge. An April 2014 implementation update observed an increase in sales calls, as well as that "OxyContin HCPs [health care providers] with increased calls consistently outperform HCPs with decreasing or no change in call frequency."

207.    McKinsey's Project Turbocharge called for Purdue to double its promotional spending. At the time of McKinsey's first known work for Purdue, Purdue spent approximately $5 million per quarter on sales and marketing. By the time McKinsey's Project Turbocharge had been implemented, total quarterly sales and marketing spending at Purdue exceeded $45 million per quarter, an increase of 800%.

208.    Scientific evidence demonstrates a close link between opioid prescriptions and opioid abuse. For example, a 2007 study found "a very strong correlation between therapeutic exposure to opioid analgesics, as measured by prescriptions filled, and their abuse."[44] McKinsey evidently understands this. In a September 2016 on-line article, McKinsey asserts that "[t]here is no doubt that more consistent use of best practices—across geographic areas, institutions, and clinicians—would provide tremendous help in combating the crisis" and describes certain examples of such practices as "successful in reducing prescribing."[45]

209.    There is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and

---

[44] Theodore J Cicero et al., Relationship Between Therapeutic Use and Abuse of Opioid Analgesics in Rural, Suburban, and Urban Locations in the United States, 16.8 Pharmacoepidemiology and Drug Safety, 827-40 (2007).
[45]   https://wwwmckinsey.com/industries/healthcare-systems-and-services/our-insights/why-we-need-bolder-action-to-combat-the-opioid-epidemic.

associated adverse outcomes."[46] The opioid epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[47]

210.    In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses." Patients receiving opioid prescriptions for chronic pain account for the majority of overdoses. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."[48]

211.    Compounding the harm from deceptive marketing, McKinsey worked with Purdue to continue and grow the opioid sales of prescribers that raised red flags of diversion, despite Purdue's legal obligations to report and halt supply. In doing so, it enabled an oversupply of opioids, which allows non-patients to become exposed to opioids, and facilitates access to opioids for both patients who could no longer access or afford prescription opioids and addicts struggling with relapse.

212.    Indeed, the Supreme Court has long recognized the inherent causal relationship between diversion of opioids and harm to the public. Direct Sales Co., 319 U.S. at 710-11 ("The difference between sugar, cans, and other articles of normal trade, on the one hand, and narcotic drugs, machine guns and such restricted commodities, on the other, aris[es] from the latters' inherent capacity for harm and from the very fact they are restricted . . . .").

213.    Most of the illicit use originates from prescribed opioids. It has been estimated that 60% of the opioids that are abused come, directly or indirectly, through physicians' prescriptions.

---

[46] Dart, MD, et al., Trends in Opioid Analgesic Abuse and Mortality in the United States, New Engl. J. Med., 372:241-248 (Jan. 15, 2015).
[47] Califf, MD, et al., A Proactive Response to Prescription Opioid Abuse, New Engl. J. Med. (Apr. 14, 2016).
[48] CDC, January 1, 2016 Morbidity and Mortality Weekly Report; Rudd, Rose A., et al. "Increases in drug and opioid overdose deaths—United States, 2000–2014." American Journal of Transplantation 16.4 (2016): 1323-1327.

214.    As McKinsey itself has recognized in citing a study reaching this conclusion, roughly 80% of heroin users previously used prescription opioids.[49]

215.    In fact, people who are addicted to prescription opioid painkillers are 40 times more likely to be addicted to heroin. The CDC identified addiction to prescription pain medication as the strongest risk factor for heroin addiction. A more recent, and even more deadly problem stemming from the prescription opioid epidemic involves fentanyl—a powerful opioid prescribed for cancer pain or in hospital settings that, in synthetic form, has made its way into Louisiana.

216.    Carfentanil, a powerful derivative of fentanyl, has increasingly been found in heroin and fentanyl sold illicitly. Carfentanil is so strong that it is typically used in veterinary medicine to sedate large wild animals such as elephants, and has been researched as a chemical weapon. A dose the size of a grain of salt can rapidly lead to deadly overdose in humans. In July of 2016, Akron, for example, saw 236 overdose cases in just 21 days, with at least 14 fatalities suspected to be linked to Carfentanil.

217.    157. No demographic is untouched by this epidemic. Nationally, one in five deaths among younger adults in 2016 involved opioids, according to one study. And, deaths involving both prescription and illicit opioids have risen sharply, nearly doubling since 2009.

218.    Opioid addiction and misuse also result in an increase in emergency room visits, emergency responses, and emergency medical technicians' administration of Narcan or naloxone—the antidote to opioid overdose. Once addicted, people working to recover may struggle with their addiction their entire lives.

---

[49] https://wwwmckinsey.com/industries/healthcare-systems-and-services/our-insights/why-we-need-bolder-action-to-combat-the-opioid-epidemic.

219.    Opioids have caused injury and illness in Plaintiffs' communities in other respects as well. An increase in Hepatitis C, according to the CDC, is directly tied to intravenous injection of opioids.

220.    The deceptive marketing, overprescribing, and oversupply of opioids also had a significant detrimental impact on children. Young children have access to opioids, nearly all of which were prescribed or supplied to adults in their household. If parents become addicted and turn to illicit opiates, children risk overdose from these drugs as well.

221.    Even infants have not been immune to the impact of opioid abuse. There has been a dramatic rise in the number of infants who are born addicted to opioids due to prenatal exposure and suffer from neonatal abstinence syndrome ("NAS," also known as neonatal opioid withdrawal syndrome, or "NOWS"). These infants painfully withdraw from the drug once they are born, cry nonstop from the pain and stress of withdrawal, experience convulsions or tremors, have difficulty sleeping and feeding, and suffer from diarrhea, vomiting, and low weight gain, among other serious symptoms. The long-term developmental effects are still unknown, though research in other states has indicated that these children are likely to suffer from continued, serious neurologic and cognitive impacts, including hyperactivity, attention deficit disorder, lack of impulse control, and a higher risk of future addiction. When untreated, NAS can be life-threatening. In 2009, more than 13,000 infants in the United States were born with NAS, or about one every hour.

222.    This dramatic rise in NAS may be described as an epidemic within an epidemic.

223.    Rising opioid use and abuse have negative social and economic consequences far beyond overdoses in other respects as well. According to an analysis by a Princeton University economist, approximately one out of every three working-age men who are not in the labor force take daily prescription pain medication. The same research finds that opioid prescribing alone

accounts for 20% of the overall decline in the labor force participation for this group from 2014-16, and 25% of the decline in labor force participation among women. Many of those taking painkillers still said they experienced pain daily.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### PUBLIC NUISANCE, LA. R.S. § 13:4722

224.    Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

225.    Plaintiffs bring these claims against McKinsey under Louisiana law, which confers upon the Plaintiffs the power to suppress all nuisances that are or may be injurious to the health of their citizens.   Plaintiffs further seek to recover costs associated with the nuisance and its abatement.

226.    McKinsey's misrepresentations and omissions regarding opioids, as set forth above and in the Purdue, Janssen, and Endo marketing plans, have fueled an opioid epidemic in the Plaintiff's areas, that constitutes a public nuisance.   McKinsey and Purdue, Janssen, and Endo knowingly exacerbated a condition that affects entire communities, neighborhoods, and considerable numbers of persons.

227.    McKinsey's misrepresentations and omissions regarding opioids, generally, and Purdue's, Janssen's, and Endo's opioids, specifically, constitute unlawful acts and/or omissions of duties, that annoy, injure, or endanger the comfort, repose, health, and/or safety of others.   The annoyance, injury, and danger to the comfort, repose, health, and safety of the Plaintiffs' citizens includes, but is not limited to:

   a.   Drug overdose deaths had already increased from 1999 to 2012. After McKinsey began advising Purdue, Janssen, and Endo on sales and marketing strategy,

overdose death surpassed car crash deaths. McKinsey crafted a strategy that tripled OxyContin sales during that time;

b.  From 2000 to 2016, Louisiana unintentional poisoning death rate effectively quadrupled, from 187 deaths to 934 deaths. Prescription opioid contributed to the majority of those deaths.   During the following years, McKinsey developed "Project Turbocharge," which was adopted as the national sales scheme for the following year, under the rubric of "Evolve to Excellence";

c.  In 2015, one year after Purdue implemented McKinsey's strategy through "Evolve to Excellence," Louisiana suffered  804 deaths due to intentional poisoning.

d.  Prescription opioid addiction often leads to illicit opioid use and addiction;

e.  According to the Centers for Disease Control, past misuse of prescription opioids is the strongest risk factor for heroin initiation and use;

f.  Louisiana hospitals are reporting increasing numbers of newborns testing positive for prescription medications; and

g.  McKinsey's crafted deceptive marketing strategies that were prepared for Purdue, Janssen, and Endo, and then purchased and implemented by Purdue, Janssen, and Endo, with McKinsey's ongoing assistance. These strategies enflamed, purposefully, an opioid abuse and addiction epidemic that has caused Plaintiffs, their businesses, communities and citizens to bear an enormous social and economic cost including, increased health care, criminal justice, and lost work productivity expenses, among others.

228.   McKinsey created and maintained a public nuisance which proximately caused injury to Plaintiffs.

229.    A public nuisance is an unreasonable interference with a right common to the general public.

230.    McKinsey has created and maintained a public nuisance by developing and implementing deceptive marketing strategies and efforts to boost opioid sales in ways that unreasonably interfere with the public health, welfare, and safety in Plaintiffs' communities, and Plaintiffs and their residents have a common right to be free from such conduct and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

231.    The public nuisance is an absolute public nuisance because McKinsey's nuisance-creating conduct was intentional and unreasonable and/or violated statutes which established specific legal requirements for the protection of others.

232.    McKinsey has created and maintained an absolute public nuisance through its participation in the deceptive marketing of opioids.

233.    McKinsey knew, and has known, that its intentional, unreasonable, and unlawful conduct would cause, has caused, and continues to cause opioids to be used and possessed illegally and that its conduct has produced an ongoing nuisance that has had, and will continue to have, a detrimental effect upon the public health, welfare, safety, peace, comfort, and convenience of Plaintiffs and their residents.

234.    McKinsey, in a joint effort with and on behalf of, Purdue, intentionally and unreasonably and/or unlawfully marketed and participated in Purdue pushing as many opioids onto the market as possible, fueling addiction to and diversion of these powerful narcotics, resulting in increased addiction and abuse, an elevated level of crime, death and injuries to the residents of Plaintiffs' communities, a higher level of fear, discomfort and inconvenience to the residents of Plaintiffs' communities, and direct costs to Plaintiffs.

235.   McKinsey is liable for creating the public nuisance because its intentional and unreasonable and/or unlawful conduct was a substantial factor in producing the public nuisance and harm to Plaintiffs.

236.   In marketing of and efforts to boost sales of opioids in Louisiana and Plaintiffs' communities, McKinsey violated federal law, including, but not limited to 18 U.S.C. § 2 and 21 U.S.C. § 846 with respect to Purdue's violation of 21 U.S.C.A. § 823 and 21 C.F.R. § 1301.74.

237.   McKinsey's intentional and unreasonable nuisance-creating conduct, for which the gravity of the harm outweighs the utility of the conduct, includes aiding, abetting, conspiring in, and expanding the distribution and sale of opioids without maintaining effective controls against the diversion of opioids and in ways that facilitated and encouraged their flow into the illegal, secondary market;

238.   The nuisance created by McKinsey's conduct is abatable.

239.   Plaintiffs seek all equitable relief as allowed by law, including *inter alia* injunctive relief, restitution, disgorgement of profits, attorney fees and costs, and pre- and post-judgment interest.

## SECOND CAUSE OF ACTION
## CIVIL CONSPIRACY, LA. CIV. CODE ART. 2324

240.   Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

241.   McKinsey, Purdue, and other opioid manufacturers working together for decades, agreed to commit numerous unlawful acts relating to the sales and marketing of Purdue's opioid products.  McKinsey, Purdue, and other opioid manufacturers also agreed to use unlawful means to commit lawful acts as part of these sales and marketing efforts.

242.    McKinsey, Purdue, and other opioid manufacturers agreed to pursue the unlawful act of knowingly misrepresenting the addictive nature of opioids in marketing OxyContin to health care providers within the Plaintiff's territory.

243.    McKinsey, Purdue, and other opioid manufacturers deployed the unlawful means of evading Purdue's reporting and compliance obligations to the Inspector General of the United States Department of Health and Human Services for the five years Purdue was subject to a Corporate Integrity Agreement after it pled guilty in 2007 to criminal misbranding.  McKinsey assisted Purdue, and other opioid manufacturers with evading these compliance obligations to accomplish the lawful act of maximizing OxyContin revenue to Purdue.

244.    McKinsey, Purdue, and other opioid manufacturers engaged in unfair trade practices, including intentionally downplaying of the risks, overstating the benefits, and misrepresenting the medically necessity of opioids, generally, and Purdue's, Janssen's, and Endo's opioids, specifically, including for off-label uses.  These practices offend established public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

245.    McKinsey knowingly made or caused to be made false or misleading representations as to the characteristics, ingredients, uses, and benefits of opioids, generally, of Purdue's, Janssen's, and Endo's opioids, specifically, by downplaying the risks of addiction and abuse, overstating the efficacy, and misrepresenting the medical necessity of opioids, generally, and Purdue's, Janssen's, and Endo's opioids, specifically.

246.    McKinsey, a majority of the Purdue board, Purdue, and other opioid manufacturers agreed to deploy unlawful sales and marketing tactics to achieve the lawful purpose of maximizing revenue of a closely-held company.

247.    As a consequence, McKinsey is jointly and severally liable with Purdue, Janssen, and Endo for the sales and marketing practices used to promote Purdue's, Janssen's, and Endo's opioid products including OxyContin.

248.    Taken together, the interaction and length of the relationship between and among McKinsey and Purdue as well as, upon information and belief, Janssen and Endo, reflects a deep level of interaction and cooperation between the two groups in a tightly knit industry with a common interest in preserving and expanding a broader market for opioids.

249.    Plaintiffs were damaged as a result of unlawful acts McKinsey conspired with Purdue, Janssen, and Endo to commit.

250.    McKinsey aided Purdue in unlawfully failing to act to prevent diversion and failing to monitor for, report, and prevent suspicious orders of opioids.

251.    McKinsey's overt acts in furtherance of this conspiracy include, but are not limited to, designing and implementing marketing messages that:

     a.    comprised untrue, false, unsubstantiated, and misleading marketing, directly and with and through third parties in violation of 21 C.F.R. § 202.1(e), thereby causing opioid drugs to be misbranded;

     b.    promoted other purported advantages of OxyContin, including but not limited to improved function and quality of life in violation of FDA regulations, including 21 C.F.R. § 202.1(e).

### THIRD CAUSE OF ACTION
### UNJUST ENRICHMENT, LA. CIV. CODE ART. 2298

252.    Plaintiffs reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged in this Count.

253.    Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

254.    McKinsey was compensated for its work increasing opioid sales for Purdue, Janssen, and Endo.

255.    This compensation for increasing sales of Purdue's, Janssen's, and Endo's deadly products constitutes money in the possession of McKinsey that, in equity and good conscience, McKinsey ought not be allowed to retain.

256.    Plaintiffs have expended substantial amounts of money in an effort to remedy or mitigate the societal harms caused by McKinsey's conduct.

257.    Plaintiffs have conferred a benefit upon McKinsey by paying for McKinsey's externalities: the cost of the harms caused by McKinsey's improper practices and the marketing and distribution practices it created and helped to implement for Purdue.

### FOURTH CAUSE OF ACTION
### VIOLATION OF RICO, 18 U.S.C. § 1961 *ET SEQ.* and
### VIOLATIONS OF LOUISIANA RACKETEERING ACT
### (LSA-R.S.  § 15:1351 et seq.)

258.    Plaintiffs reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged in this Count.

259.    McKinsey and the opioid manufacturers are "persons" within the meaning of 18 U.S.C. § 1961(3) which conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962.

260.    Plaintiffs were injured in their business or property as a result of McKinsey's wrongful conduct and is a "person" who can bring an action for violation of section 1962, as that term is defined in 18 U.S.C. § 1961(3).

261.    Under Section 1962(a), it is

unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

262.     Further, Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions.

263.     McKinsey and the participating opioid manufacturers conducted the affairs of an enterprise through a pattern of racketeering activity, hereinafter the "Opioid Marketing Enterprise," in violation of 18 U.S.C. § 1962(c) and § 1962(d).

264.     RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

265.     A RICO "enterprise" need not have any formal legal structure, so long as it has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose. *See Boyle v. United States*, 556 U.S. 938, 946 (2009).

266.     McKinsey conducted its business through legitimate and illegitimate means in the form of an association-in-fact enterprise and/or a legal entity enterprise. At all relevant times, the McKinsey and opioid manufacturers operated as an association in fact and included unlawful, as well as lawful, enterprises as defined by LSA-R.S. § 15:1352(B).

267.     LSA-R.S. § 15:1353 makes it "unlawful for any person employed by, or associated with, any enterprise knowingly to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity," and it is unlawful for any person to "conspire or attempt to violate any of the provisions" of LSA-R.S. § 15:1353.

268.    LSA-R.S. § 15:1352(B) defines the term "enterprise" is defined as including "any individual, sole proprietorship, partnership, corporation or other legal entity, or any unchartered association or group of individuals associated in fact and includes unlawful as well as lawful enterprises and governmental as well as other entities."

269.    McKinsey and its associated-in-fact opioid manufacturers were members of a legal entity enterprise within the meaning of LSA-R.S. § 15:1352, through which McKinsey and its associated-in-fact opioid manufacturers conducted their pattern of racketeering activity in the State of Louisiana.

270.    McKinsey and/or its associates-in-fact misconduct violated: R.S. § 14:67 (Theft), R.S. § 40:967(A) (Manufacture; distribution of Schedule II controlled dangerous substances); R.S. § 14:230 (Money laundering); R.S. § 14:133 (Filing or maintaining false public records); and § 14:70:1 (Medicaid fraud).

271.    Plaintiffs are entitled to treble damages for their injuries under LSA-R.S. § 15:1356(E).

A.    Description of the Enterprise.

272.    In order to unlawfully increase the demand for opioids, McKinsey and opioid manufacturers formed an Opioid Marketing Enterprise.

273.    Alternatively, McKinsey and each of the participating opioid manufacturers constitutes a single legal entity or associated-in-fact "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the members of the enterprise conducted a pattern of racketeering activity.

274.    While McKinsey participated in the Opioid Marketing Enterprise, McKinsey also existed separate and distinct from the Opioid Marketing Enterprise.

275.     McKinsey and the opioid manufacturers, including Purdue and, upon information and belief, Janssen and Endo, maintained an interest and control of the Opioid Marketing Enterprise and also conducted and participated in the conduct of the Opioid Marketing Enterprise's affairs through a pattern of racketeering activity.

276.     The Opioid Marketing Enterprise engaged in, and its activities affected, interstate and foreign commerce because it involved commercial activities across state boundaries, including but not limited to: (1) the marketing, promotion, and advertisement of prescription opioids, and (2) the issuance of fees, bills, and statements demanding payment for prescriptions of opioid medications and consulting fees for McKinsey.

B.   The Members used the Opioid Marketing Enterprise to fraudulently increase profits and revenues through a pattern of racketeering activity.

277.     The persons engaged in the Opioid Marketing Enterprise are systematically linked through contractual relationships, financial ties, and long-term coordination of activities, as spearheaded by McKinsey and its manufacturer partners, as described in the allegations above, incorporated by reference herein. Typically, this communication occurred, and continues to occur, through the use of the wires and the mail in which McKinsey and the other Enterprise members shared information regarding the operation of the Opioid Marketing Enterprise.

278.     Specifically, the members of the Opioid Marketing Enterprise have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

279.     In devising and executing the illegal scheme, the members of the Opioid Marketing Enterprise devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiffs

and the public to obtain money by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

280.    For the purpose of executing the illegal scheme, the members of the Opioid Marketing Enterprise committed these racketeering acts, intentionally and knowingly with the specific intent to advance the illegal scheme.

281.    The Opioid Marketing Enterprise's predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

  a.  Wire Fraud: The members of the Opioid Marketing Enterprise violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, fraudulent materials by wire for the purpose of selling drugs, specifically opioids, that have little or no demonstrated efficacy for the pain they are purported to treat in the majority of persons prescribed them.

  b.  Violation of Controlled Substances Act ("CSA"). The members of the Opioid Marketing Enterprise violated 21 U.S.C. § 483(a)(4), which makes it unlawful "for any person to knowingly or intentionally furnish false or fraudulent information in, or omit any material information from, any application, report, record or other document required to be made, kept or filed under this subchapter," and a violation of which is punishable by up to four years in jail, *see* 21 U.S.C. § 483(d)(1), making it a felony.

282.    The wire transmissions were made, and the omissions of information required to be reported under the federal Controlled Substances Act were undertaken, in furtherance of the fraudulent scheme and common course of conduct to expand the market for opioids and increase their profits through misleading and deceptive marketing and turning a blind eye to potential diversion.

283.    The multiple acts of racketeering activity which the members of the Opioid Marketing Enterprise committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

284.    The members' control and participation in the Opioid Marketing Enterprise were necessary for the successful activity in which McKinsey engaged that included but was not limited to the acts detailed above.

285.    Through their personal relationships, the members of the Opioid Marketing Enterprise had the opportunity to form and take actions in furtherance of the Opioid Marketing Enterprise's common purpose. The Enterprise's wire fraud and CSA violations, and conspiracy to commit wire fraud were each the proximate cause of Plaintiffs' damages as detailed herein. These violations occurred through the execution of McKinsey's and opioid manufacturer members' scheme using omissions of material fact and affirmative misrepresentation, and engaging in such promotional efforts even in the face of signs growth in opioid sales was in part due to non-medical use, to perpetrate the fraud upon Plaintiffs and the public.

286.    To achieve the common goal and purpose of the Opioid Marketing Enterprise, the members hid from the prescribers and the public the fraudulent nature of the marketing scheme and the true nature of the relationship between the members of the Opioid Marketing Enterprise.

287.    As public scrutiny and media coverage focused on how opioids ravaged community in throughout the United States, McKinsey did not challenge Purdue or other manufacturers' misrepresentations or seek to correct their previous misrepresentations. Instead of terminating its role in the Opioid Marketing Enterprise, correcting deceptive messages, or reporting suspicious activity, McKinsey continued to participate in the Opioid Marketing Enterprise for financial gain.

288.    As a result of McKinsey's racketeering activity, Plaintiffs have been injured in their business and property, including but not limited to injury in the form of costs of providing emergency, child-protective, law-enforcement, and other services to combat opioid addiction and overdose.

289.    McKinsey's violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiffs, who are entitled to bring this action for three times its actual damages, as well as injunctive/equitable relief, costs, and reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c).

## FIFTH CAUSE OF ACTION
## VIOLATION OF LUTPA, LA. R.S. § 51:1401 *ET SEQ.*

290.    The Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

291.    In the course of its business, McKinsey unfairly and unconscionably worked with to aggressively promote and sell more opioids to more patients for longer periods of time.

292.    Such actions constitute unfair trade practices that are prohibited by LUTPA.

293.    Such actions or practices described herein occurred in trade or commerce as defined in LUTPA.

294.    McKinsey's actions and practices directly and proximately caused the Plaintiff's injuries.

## SIXTH CAUSE OF ACTION
## NEGLIGENCE, La. Civ. Code art. 2215

295.    Plaintiffs incorporate the allegations within all prior paragraphs within this complaint as if they were fully set forth herein.

296.    McKinsey, through its work with Purdue, Janssen, and Endo owed a duty of care to the Plaintiffs, pursuant to which it would not encourage the over-marketing and over-prescribing of a controlled substance known at the time to be addictive and known at the time to be a threat to public health.

297.    In violation of this duty, for years McKinsey devised and assisted Purdue, Janssen, and Endo with implementing a sales and marketing campaign, including Purdue's Project Turbocharge, that would dramatically increase the amount of OxyContin prescribed and distributed to the Plaintiffs' citizens. In the process, McKinsey continually devised misleading claims regarding OxyContin as part of their efforts to get healthcare providers to write more and more OxyContin prescriptions.

298.    As a direct result of McKinsey's negligent conduct, Plaintiffs have suffered and will continue to suffer harm.

### SEVENTH CAUSE OF ACTION
### FRAUD, LA. CIV. CODE ART. 1953 and
### NEGLIGENT MISREPRESENTATION
### (LA. CIV. CODE ARTS. 2315 and 2316)

299.    Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

300.    McKinsey made and caused to be made false representations to healthcare providers working in Lousiana and/or omitted material facts, regarding the risks, efficacy, and medical necessity of opioids. McKinsey knew these representations were false, made recklessly without knowledge of the truth, and/or had no reasonable ground for believing such assertions. Specifically, McKinsey knowingly and/or recklessly:

   a.  Downplayed the substantial risks of addiction and other side-effects of opioids, including crafting marketing plans to affirmatively state in sales calls and other marketing channels that opioids were not as addictive or prone to abuse as they truly are; stating that classic signs of addiction were actually an indication of "pseudoaddiction" requiring additional administrations of opioids, and omitting the high risks of addiction actually present;

67

301.   McKinsey overstated the efficacy of opioids, including making false statements regarding the effectiveness of the drugs for treating specific subsets of patient population (i.e. those with osteoarthritis) and their ability to improve patient function; and

302.   McKinsey misrepresented the medical usefulness and necessity of opioids, including affirmatively marketing their drugs for off label uses (i.e. osteoarthritis) without solicitation and not in response to questions from healthcare providers.

303.   McKinsey's misrepresentations and omissions had a tendency to deceive others, to violate public confidence, and/or injure public interests. McKinsey, having chosen to craft the marketing plan used by Purdue, Janssen, and Endo to make representations to healthcare providers regarding their opioids, were under a duty to disclose the whole truth, and not to disclose partial and misleading truths.

304.   McKinsey intended that healthcare providers would rely upon McKinsey's false assertions regarding the risks, efficacy, and medical necessity of opioids to increase the number of opioid prescriptions made by healthcare providers.

305.   Healthcare providers working in Louisiana did in fact rely on the false representations made in marketing plans created by McKinsey and implemented with McKinsey's assistance.

306.   Plaintiffs seek to recover all damages caused by McKinsey's fraudulent representations, negligent misrepresentations, and implemented with McKinsey's assistance.

307.   McKinsey acted with knowledge and willful intent, with reckless disregard for the rights of others, and/or intentionally and with malice towards others. As such, Plaintiffs seek to recover maximum damages allowed by the law against McKinsey.

Dated: <u>November 18, 2022</u>          Respectfully submitted:

**STAG LIUZZA, L.L.C.**

*/s/ Michael G. Stag*
**MICHAEL G. STAG**, LA Bar No. 23314
**ASHLEY M. LIUZZA**, LA Bar No. 34645
365 Canal Street, Suite 2850
New Orleans, Louisiana 70130
Telephone: (504) 593-9600
Facsimile: (504) 593-9601
Email:  mstag@stagliuzza.com
          aliuzza@stagliuzza.com

                    -and-

**IRPINO, AVIN & HAWKINS**

*/s/ Pearl A. Robertson*
**ANTHONY D. IRPINO**, LA Bar No. 24727
**PEARL A. ROBERTSON**, LA Bar No. 34060
2216 Magazine Street
New Orleans, LA 70130
Telephone: (504) 525-1500
Facsimile: (504) 525-1501
E-mail: airpino@irpinolaw.com
          probertson@irpinolaw.com

                    -and-

**ALVENDIA, KELLY & DEMAREST, LLC**

*/s/Roderick Alvendia*
**RODERICK ALVENDIA**, LA Bar No. 25554
**J. BART KELLY**, LA Bar No. 24488
**JEANNE DEMAREST**, LA Bar No. 23032
909 Poydras Street, Suite 1625
New Orleans, Louisiana 70112
Telephone: (504) 200-0000
Facsimile: (504) 200-0001
Email:  rico@akdlalaw.com
          bart@akdlalaw.com
          jeanne@akdlalaw.com

                    - and -

**SMITH & FAWER, L.L.C.**

*/s/ Randall A. Smith*
**RANDALL A. SMITH**, LA Bar No. 2117
**STEPHEN M. GELÉ**, LA Bar No. 22385
201 St. Charles Avenue, Suite 3702
New Orleans, Louisiana 70170
Telephone: (504) 525-2200
Fax: (504) 525-2205
Email:  rasmith@smithfawer.com
        sgele@smithfawer.com

- and -

*/s/ John F. Young*
**JOHN F. YOUNG**, LA Bar No.: 01659
609 Metairie Road, # 300
Metairie, La. 70005
Telephone: (504) 352-8855
Email: john@johnyoungla.com

***Attorneys for Plaintiffs***